THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DANIEL HOLLAND, Defendant-Appellant.

First District (5th Division)   No. 81—2895

Opinion filed August 29, 1986.

SULLIVAN, P.J., dissenting.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Marie Quinlivan, and Jean Sublett, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

Following a jury trial, defendant was found guilty and was sentenced to concurrent, extended terms of imprisonment of 60 years for rape, 60 years for deviate sexual assault and 30 years for aggravated kidnaping. Defendant was also sentenced to a consecutive, extended term of 25 years for armed robbery. The trial court ordered that these sentences were to be served consecutive to any sentence the defendant would receive as a result of any parole violation.[1]

On appeal, defendant urges for reversal that: (1) he was denied his constitutional right to a jury drawn from a fair cross-section of the community; (2) his confession should have been suppressed; (3) the element of force in the armed robbery was not proved; (4) the consecutive sentences were improper; and (5) defendant was denied effective assistance of counsel.

The complainant's testimony at trial revealed that on May 4, 1980, at approximately midnight, the complainant and her boyfriend left a party, riding in her boyfriend's car. The complainant drove. The car suddenly had a flat tire and the complainant pulled the car over to the shoulder of the road. They discovered that the spare tire was also flat. After waiting an hour for assistance, the couple decided to sleep in the car. They awakened at dawn and began to walk on the shoulder of the road. Shortly afterward, defendant pulled up in his car, asked

---

[1]Some years previous, defendant was convicted of armed robbery and was sentenced to 6 to 18 years' imprisonment, of which he served 3 years and was on parole when the above offenses were committed and the sentences imposed.

what was wrong, and offered to give the complainant and her boyfriend a ride home. Accepting the invitation, the couple got in defendant's car. The complainant sat in the front seat and her boyfriend sat in the back seat.

After driving for a while, defendant pulled off the road and stopped the car, he grabbed the complainant, brandished a knife against her throat, ordered the boyfriend to get out of the car, and threatened to kill them if the boyfriend did not do so. The complainant's boyfriend got out of the car. The complainant pleaded with the defendant to release her. The defendant said he would let her go when he was through with her. He pulled her nearer to him and continued driving while holding the knife under the complainant's arm. Defendant then pulled his car into a parking lot. The complainant was ordered to take off her clothes or get "cut up." As the complainant disrobed, the defendant cut her brassiere and forced her to perform an act of oral copulation.

During this ordeal, defendant complained that the complainant was not sexually performing the way he wanted and he cut the complainant's upper thigh with his knife. The complainant testified that the defendant threatened to kill her if she did not do what he wanted. They got back in the car.

The defendant continued driving. The defendant then pulled into an alley where he and the complainant again got out of the car. The defendant forced the complainant to have intercourse with him twice and to perform oral copulation on him. The complainant testified that she did not attempt to leave nor did she cry out for help because she was only partially clothed. The defendant took the complainant's money (approximately $60), driver's license and school identification card and threatened to kill her if she reported the incident to the police. The defendant then allowed the complainant to get dressed outside the car and leave. The complainant testified that as she walked away she turned and noticed that the defendant's car did not have a rear license plate. The complainant ran to a grocery store where she used the washroom and called home. Her brother came to pick her up and immediately drove her to a police station. After reporting the incident to the police, the complainant was taken to a hospital. From the hospital, the complainant was driven to the places she had been taken by the defendant and then went back to the police station where she identified the defendant's picture from a group of photographs.

During the time the complainant was with the defendant, the complainant's boyfriend called the police. The police radioed a descrip-

tion of the defendant and the type of car he was driving. Defendant was arrested at about 8:15 a.m. when he was stopped by the police for driving without a rear license plate. The defendant did not have a valid driver's license. He was taken to the Schiller Park police station where a hunting knife, the complainant's high school identification card and $58.80 were taken from him.

The defendant was taken from the Schiller Park police station to the Des Plaines police station where he was interviewed by two assistant State's Attorneys and a police officer. At approximately 2:30 p.m. at the Des Plaines station, the defendant confessed to sexually assaulting the complainant.

Prior to trial, the trial court sustained defendant's motion to suppress the defendant's initial confession made at the Schiller Park police station. The court found that "there was physical confrontation between the Schiller Park police officers and the defendant. Under the circumstances, when it was that this occurred, it is not really necessary for me to make a determination ***. I feel that that degree of physical confrontation contaminates any statements defendant would have made at the Des Plaines police station were denied."

Defendant contends that his constitutional right to a jury drawn from a fair cross-section of the community was denied because a disproportionately small number of blacks were available for *voir dire* jury selection. Over 40 jury veniremen, of whom two were black, were assembled, from which the jury was selected. The State used two peremptory challenges to excuse the two blacks and 10 peremptory challenges to exclude white jurors. There were no black members of the jury. Defendant is Caucasian.

The State contends that defendant failed to preserve this issue for review by failing to raise an objection prior to the *voir dire* examination. The State points out that section 114—3 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, pars. 114—3(a), (b)) provides:

> "(a) Any objection to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel prior to the voir dire examination. ***
>
> (b) The motion shall be in writing supported by affidavit and shall state facts which show that the jury panel was improperly selected or drawn."

The State contends that (1) contrary to the requirements of this statute, defense counsel made an objection to the jury array *after* the *voir dire* examination had begun and a panel of jurors sworn in; (2) although the court granted defense counsel leave to file a written mo-

tion, defense counsel failed to do so; (3) there is no written motion in the record, supported by an affidavit, challenging the selection of prospective jurors; and (4) defendant's motion for a new trial failed to raise the issue of the alleged improper jury array.

The question of whether it is a constitutional violation for the State to use its peremptory challenges to systematically exclude blacks from the jury solely because of their race was recently decided, on April 30, 1986, by the United States Supreme Court in *Batson v. Kentucky* (1986), 476 U.S. ___, 90 L. Ed. 2d 69, 106 S. Ct. 1712. In that case, the Supreme Court held that the equal protection clause of the fourteenth amendment forbids the State through its use of peremptory challenges from excluding jurors solely on account of race. We do not rule on this issue for the reasons that (1) we reverse the case at bar on other grounds and remand for a new trial; (2) the parties and trial judge in the instant case did not have the benefit of the *Batson* decision when the alleged peremptory challenge improprieties occurred; and (3) with *Batson* now controlling, it is highly unlikely that this issue will recur on retrial.

Defendant next contends that it was error for the trial court to admit his confession because the police failed to inform him while he was in custody at the Des Plaines police station that his attorney, Anthony Rocco, had called the station in an effort to contact him. At the pretrial hearing on defendant's motion to suppress his confession, Assistant State's Attorney Ira Raphaelson testified for the State that he arrived at the Des Plaines police station between 1 p.m. and 1:30 p.m. and that he interviewed the defendant at about 2 p.m. Assistant State's Attorney Howard Freedman and Officer John Meese were also present at this interview. Raphaelson testified that he told the defendant that he and Freedman were not public defenders and that he informed the defendant of his *Miranda* rights. According to Raphaelson, defendant responded that he understood his rights and was willing to talk. Raphaelson further testified that at about 2:30, he, Officer Meese and Assistant State's Attorney Freedman had a second conversation with the defendant, during which time the defendant gave a confession of his involvement in the offenses.

Raphaelson testified that he did not talk to defendant's attorney, Anthony Rocco, until after the defendant confessed and that it was about 3 p.m. when he talked to Rocco on the telephone. Raphaelson testified that Rocco told him "that he had something to do with the family of Daniel Holland," and wanted to know what charges were being filed against his client. Raphaelson told Rocco that he "was not free to divulge that information," and that no decision had been made

on what charges would be filed against defendant.

Cross-examination of Raphaelson disclosed that he had a telephone conversation with Officer Bauer of the Schiller Park police station before Raphaelson interviewed the defendant at the Des Plaines station. Raphaelson explained on cross-examination that when the defendant was stopped for a traffic violation, the defendant had a weapon and that Bauer "was seeking charges [against the defendant] for a felony unlawful use of weapons." Later that morning, Raphaelson further testified, he again spoke to Bauer who "indicated *** that they believed that Mr. Holland [defendant] was a suspect *** in a rape matter in Des Plaines." Defendant's attorney, Anthony Rocco, then asked Raphaelson the following questions on cross-examination:

"Q. Now, you say you first saw the defendant, Daniel Holland at approximately 2:05 p.m. that day is that right?

A. I may have taken a look at him before I spoke to him. It would have been approximately that time.

Q. And that is the first time you had a conversation with him, right?

A. That is correct.

Q. And he didn't ask for any attorney, is that correct?

A. No, he did not.

Q. *All right, and were you aware of the fact that I was attempting to communicate with Mr. Holland during that point in time?*

A. At that point in time, no.

Q. Officer Meese never said that to you?

A. No, I don't believe so.

Q. Officer Meese ever tell you that I talked to him regarding Daniel Holland?

A. He probably did mention it." (Emphasis added.)

Raphaelson also testified on cross-examination that he interrupted his interview of the defendant and had a conversation in another room. Freedman, the other assistant State's Attorney, came back into the interview room, and when Raphaelson returned he resumed his interview of the defendant in the presence of Freedman and Officer Meese. Defendant's attorney, Rocco, again queried Raphaelson on cross-examination as follows:

"Q. Did Investigator *** Meese ever tell you I had phoned at that time?

A. No.

Q. Did he ever tell you that I asked that I'd be given an op-

portunity to speak to my client and see him before any interrogation took place? That I had been retained?

A. There was some discussion at some point that an attorney or someone claiming to be an attorney had called.

Q. Did he ever tell you I left my phone number with him to call me back?

A. I don't recall.

Q. Did he ever tell you the name of the person who claimed to be the attorney for Daniel Holland?

A. No."

Testifying further on cross-examination, Raphaelson stated that he concluded the interview of the defendant at about 2:55 and that at approximately 3:00 he talked on the telephone to Rocco, who had called the Des Plaines police station. Raphaelson testified that Rocco may have told him in this telephone conversation that defendant's family wanted him to represent the defendant but that the only inquiry Rocco made to Raphaelson was to ask what charges would be brought against the defendant. Raphaelson testified that he again talked to Rocco, this time in person, at about 3:45 p.m. in the lobby of the Des Plaines police station. Raphaelson told Rocco what charges Raphaelson had approved to be brought against the defendant, which charges he approved between 3:30 and 3:45 p.m.

Detective Meese of the Des Plaines police station next testified for the State at the pretrial hearing on defendant's suppression motions. Meese stated that he talked to defendant's attorney, Anthony Rocco, between noon and 12:15 and that Rocco requested that he be notified if the defendant was transported to the Des Plaines police station for a lineup. Meese said that Rocco asked whether defendant had been charged with an offense in Des Plaines and that Meese answered no. Meese testified he called Rocco's home between 2:30 and 2:45 p.m. to notify Rocco that a lineup would be held, but Rocco was not home.

On cross-examination, Rocco asked Meese whether he recalled that Rocco had asked, "Please call me as soon as Mr. Holland arrives at the station." Meese answered, "You requested to be called if he was transported to our station and was going to be put into a lineup." The following cross-examination occurred:

"Q. And you said you tried to call me about 2:35 to 2:45 that afternoon, is that correct?

A. That is correct.

\* \* \*

MR. ROCCO: Were you aware of the fact *I called the police*

*department also at 2:00 o'clock p.m. that day?*

A. No, I'm not.

Q. Were you informed of the fact *I formally requested to speak to my client at that time again?*

A. No, I was not.

Q. And were you aware of the fact that your department told me that my client was being processed and could not come to the telephone?

A. I'm not aware of that.

Q. Were you aware of the fact that *I again formally requested that the law authorities present in the station not interrogate my client until I was present and had an opportunity to confer with my client beforehand and during any interrogation?*

A. I'm not aware of that.

Q. Are you aware of the fact that I arrived at that station at 3:47 p.m. that day?

A. No, I'm not.

Q. Were you aware of the fact that I asked to see my client, formally requested to see and speak with him and was told that I would have to go into a waiting room and wait ten to twenty minutes before he came out?

A. I'm not aware of that.

Q. Were you aware of the fact I had to interview my client in a small room through a glass wall and speak to him through metal grating?

MR. BREDEMANN [assistant State's Attorney]: Objection.

THE COURT: Basis?

MR. BREDEMANN: Irrelevant, Judge, after the statement.

THE COURT: I'm going to leave it in, if he knows. Overruled. You may answer.

THE WITNESS: I'm not aware of where you talked to the man." (Emphasis added.)

After the State rested on the hearing of defendant's motion to suppress his statements, defendant was given leave to reopen the hearing. Defendant called to testify Schiller Park police officer Robert Bauer, who arrested the defendant, Patricia Holland, defendant's wife, and defendant Daniel Holland. Defendant's attorney, Anthony Rocco, also testified at this time.

Rocco stated that on May 4, 1980, at about 3:47 p.m., he went to the Des Plaines police station and asked to see the defendant. Rocco said he "was ushered into this little room. [The defendant] was

brought in on the other side of the glass. \*\*\* I detected that he had a limp when he came into the room. \*\*\* I introduced myself to him, because this was the first time I had ever met him. He introduced himself to me." Rocco testified that the defendant started to complain about his chin and said he had been beaten in the Schiller Park police station, had been hit "in areas where he could not be seen" and that his ribs were hurting him. Rocco said the defendant told him that "they" had beaten him on his right knee with a billy club or a night stick and when Rocco asked to see the injury, defendant rolled up his pants to reveal his right knee which "was really discolored quite a bit." Rocco said defendant was taking pain pills.

Following attorney Rocco's testimony, he and Assistant State's Attorney Bredemann argued defendant's motion to suppress defendant's confession and the evidence seized from him when he was arrested. During Rocco's argument, Rocco again accused the officers at the Schiller Park station of beating the defendant and Officer Meese of not honoring Rocco's request to be present during any interrogation of defendant.

In ruling on defendant's motion, the trial court stated:

"[T]here is no question that some degree of confrontation took place in Schiller Park because the officers in those cases are complainants, and there is no question that the defendant apparently sustained some injury. Whether or not he sustained those in being apprehended as a consequence of the particular traffic stop in that instance, or whether he was beaten shall be for me to weigh upon, but there was physical confrontation between the Schiller Park police officers and the defendant. Under the circumstances, when it was that this occurred, it is not really necessary for me to make a determination.

I find, and I do find that inasmuch as there was a physical, apparently very severe physical confrontation from that night, had obtained leave and obtained a complaint, and have filed informations alleging aggravated battery.

Defense counsel observed physical injuries to the right knee of the defendant, and signs [sic] defendant's complaint after 3:47 on May 4, 1980 at the Des Plaines police station.

I feel that that degree of physical confrontation contaminates any statements defendant would have made at the Schiller Park Police Station, and accordingly any statements made relevant to this cause made by the defendant in the Schiller Park Police Station before this Court are hereby suppressed, and suppressed in toto."

Regarding the defendant's statements he subsequently made at the Des Plaines station, the court found that the defendant had received *Miranda* warnings "in full or in part at least five times, and that he was not a neophyte, he had been exposed to police departments on prior other occasions" and that no physical cruelty was proved to have been exerted by the Des Plaines police. The court denied the defendant's motion to suppress the statements he made at the Des Plaines police station.

Defendant contends that, since the trial court found that his statements that were made at the Schiller Park police station were the product of police brutality and therefore involuntary, the trial court should have also found that the brutality and involuntariness carried over to the statements the defendant made shortly thereafter at the Des Plaines police station and that those statements should also have been suppressed. We decline to rule on whether the Schiller Park police brutality carried over to invalidate defendant's Des Plaines police station confession inasmuch as we agree with the defendant's further contention that he did not waive his right to counsel during the custodial interrogation at the Des Plaines station because the police did not tell him that his attorney was trying to reach him.

■ The Illinois Supreme Court has held that the police have a duty to inform a defendant undergoing custodial interrogation of efforts by his attorney to consult with him and that the defendant's statements should be suppressed if this is not done. (*People v. Smith* (1982), 93 Ill. 2d 179, 442 N.E.2d 1325.) In *Smith*, the defendant and an accomplice were arrested shortly before midnight. At 5:30 a.m. the next day, they met with a private attorney who agreed to represent them. Later that morning, they were advised by a judge of the charges against them. The defendant and his accomplice were then transported to another county jail.

At approximately 3 p.m. that same day, another attorney from the original attorney's law firm arrived at the jail where the defendant had been transported. The attorney was denied access to the defendant, because, the jailer told her, the defendant was going through heroin withdrawal. The attorney wrote on one of her business cards that she was the original attorney's partner and that the defendant should not make a statement without one of his lawyers present. Defendant was later interrogated and gave a statement without his attorney being notified.

Reversing this court's affirmance of the defendant's conviction and remanding the cause for a new trial, the Illinois Supreme Court held that pursuant to the fifth amendment protection against self-in-

crimination, the defendant's statements given during his interrogation should have been suppressed, based on the defendant's right to counsel during the custodial interrogation. (*People v. Smith* (1982), 93 Ill. 2d 179, 185, 442 N.E.2d 1325.) Citing the decision in *State v. Haynes* (1979), 288 Or. 59, 602 P.2d 272, *cert. denied* (1980), 446 U.S. 945, 64 L. Ed. 2d 802, 100 S. Ct. 2175, the court in *Smith* observed that in *Haynes* the Supreme Court of Oregon reversed the defendant's conviction on the ground that the trial court should have suppressed the statements obtained after the police had successfully interfered with the attorney's attempt to consult with the defendant. In language applicable to the case before us, the *Haynes* court stated:

" '[W]e agree *** that when law enforcement officers have failed to admit counsel to a person in custody *or to inform the person of the attorney's efforts to reach him,* they cannot thereafter rely on defendant's "waiver" for the use of his subsequent uncounseled statements or resulting evidence against him. We believe this rule protects the suspect's right under [the State constitution] and the federal fifth and 14th amendments not to testify against himself ***.' " (Emphasis added.) *People v. Smith* (1982), 93 Ill. 2d 179, 187-88, 442 N.E.2d 1325, quoting *State v. Haynes* (1979), 288 Or. 59, 72-74, 602 P.2d 272, 278-79.

The Illinois Supreme Court in *Smith* held that when police, prior to or during custodial interrogation, refuse an attorney, appointed or retained, access to the suspect, "there can be no knowing waiver of the right to counsel *if the suspect has not been informed that the attorney was present and seeking to consult with him.* (Emphasis added.) (*People v. Smith* (1982), 93 Ill. 2d 179, 189, 442 N.E.2d 1325.) The court added that although the defendant in *Smith* had received the attorney's business card, without his being informed that the attorney had also requested to confer with him, the card and message were of little value. 93 Ill. 2d 179, 189, 442 N.E.2d 1325.

In *Moran v. Burbine* (1986), 475 U.S. ___, 89 L. Ed. 2d 410, 106 S. Ct. 1135, Cranston, Rhode Island, police arrested Burbine in connection with a local breaking-and-entering offense. To obtain legal assistance for Burbine, his sister, Sheila Ray, called the public defender's office in search of Assistant Public Defender Richard Casparian, who was representing Burbine on other unrelated charges. Casparian was not in, but Casparian's associate, Assistant Public Defender Allegra Munson, received Ray's call. Ray told Munson about Burbine's arrest and requested the public defender's office to represent Burbine. Munson promptly telephoned the Cranston police sta-

tion and asked that her call be transferred to the detective division. A man answered, "Detectives." After identifying herself, Munson inquired if Burbine was in custody and upon being advised that he was, Munson told the person that Assistant Public Defender Richard Casparian, who represented Burbine, was away from his office and unavailable, but that she would act as Burbine's attorney if the police intended to put Burbine in a lineup or question him. The unidentified male voice told Munson that neither activity was contemplated and that, "we're through with him for the night." Munson did not ask any further questions and did not leave any instructions before she hung up. The unidentified man did not tell Munson that at that very moment, three Providence police officers were at the Cranston station to question Burbine about the murder of Mary Jo Hickey in Providence three months earlier. Burbine was never told of his sister's efforts to obtain counsel for him or of Munson's telephone call to the police station.

Within an hour after Munson's telephone conversation with the Cranston police, the Providence police questioned Burbine about Hickey's murder. Burbine denied any involvement. The officers left him by himself in a small anteroom. Ten minutes later, Burbine summoned the detectives, saying he was "disgusted," "sorry" and wanted to confess. Burbine was informed of his *Miranda* rights and on three separate occasions he signed a written acknowledgement that he understood his *Miranda* rights and waived them. Burbine signed three confessions in which he admitted the murder.

The Supreme Court granted *certiorari* to decide "whether [Burbine's] confession [which was] preceded by an otherwise valid waiver must be suppressed either because the police misinformed an inquiring attorney about their plans concerning the suspect, or because they failed to inform the suspect of the attorney's efforts to reach him." The court pointed out that although Burbine was fully admonished of his *Miranda* rights, he never requested counsel and that he waived his right to remain silent and to the presence of counsel. The court stated, "although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident. *** Nor was the failure to inform respondent of the telephone call the kind of trickery that can vitiate the validity of a waiver." *Moran v. Burbine* (1986), 475 U.S. ___, ___, 89 L. Ed. 2d 410, 422, 106 S. Ct. 1135, 1142.

The court further pointed out, "Nothing we say today disables the States from adopting different requirements for the conduct of its

employees and officials as a matter of state law. We hold only that the Court of Appeals erred in construing the Fifth Amendment to the Federal Constitution to require the exclusion of respondent's three confessions." (*Moran v. Burbine* (1986), 475 U.S. ___, ___, 89 L. Ed. 2d 410, 425, 106 S. Ct. 1135, 1145.) Thus, *Moran* does not overrule or disturb our supreme court's decision in *People v. Smith* (1982), 93 Ill. 2d 179, 442 N.E.2d 1325.

Justice Stevens' dissenting opinion in *Moran*, joined by Justices Brennan and Marshall, pointed out that the majority opinion "completely rejects an entire body of law on the subject—the many carefully reasoned state decisions that have come to precisely the opposite conclusion." Justice Stevens thereupon cited 16 State court decisions,[2] including *Smith*, which held that a suspect's statements given under circumstances similar to those in *Burbine* were obtained in violation of the suspect's constitutional privilege against self-incrimination and his attendant right of counsel and such statements therefore were inadmissible as evidence against him.

Finally, we note that the *Smith* decision cited *Miranda v. Arizona* (1966), 384 U.S. 436, 465-66 n.35, 16 L. Ed. 2d 694, 718-19 n.35, 86 S. Ct. 1602, 1623 n.35, as well as several decisions from other jurisdictions in which courts suppressed statements obtained from the defendant after the police had foiled an attorney's efforts to consult with his client. Those cited cases were: *State v. Matthews* (La. 1982), 408 So. 2d 1274 (because police refused to tell defendants their attorney was available and seeking to assist, subsequent interrogation was made without informed waiver or rights under the State constitution, which incorporated the *Miranda* rights); *Commonwealth v. McKenna* (1969), 355 Mass. 313, 244 N.E.2d 560 (suspect's waiver of right to counsel at an interrogation was ineffective where police denied counsel's request to see the defendant and failed to inform the defendant

---

[2]*Weber v. State* (Del. 1983), 457 A.2d 674; *Haliburton v. State* (Fla. 1985), 476 So. 2d 192; *Blanks v. State* (1985), 254 Ga. 420, 330 S.E.2d 575; *People v. Smith* (1982), 93 Ill. 2d 179, 442 N.E.2d 1325; *State v. Matthews* (La. 1982), 408 So. 2d 1274; *State v. Jackson* (La. 1974), 303 So. 2d 734; *Lodowski v. State* (1985), 302 Md. 691, 490 A.2d 1228, *cert. denied* (1986), 475 U.S. 1086, 89 L. Ed. 2d 725, 106 S. Ct. 1469; *Elfadl v. State* (1985), 61 Md. App. 132, 485 A.2d 275; *Commonwealth v. Sherman* (1983), 389 Mass. 287, 450 N.E.2d 566; *Commonwealth v. McKenna* (1969), 355 Mass. 313, 244 N.E.2d 560; *State v. Beck* (Mo. 1985), 687 S.W.2d 155; *Lewis v. State* (Okla. 1984), 695 P.2d 528; *State v. Haynes* (1979), 288 Or. 59, 602 P.2d 272, *cert. denied* (1980), 446 U.S. 945, 64 L. Ed. 2d 802, 100 S. Ct. 2175; *Commonwealth v. Hilliard* (1977), 471 Pa. 318, 370 A.2d 322; *Dunn v. State* (Tex. 1985), 696 S.W.2d 561, *cert. denied* (1986), 475 U.S. 1089, 89 L. Ed. 2d 732, 106 S. Ct. 1478; *State v. Jones* (1978), 19 Wash. App. 850, 578 P.2d 71.

of the attorney's presence and request); *Commonwealth v. Hilliard* (1977), 471 Pa. 318, 370 A.2d 322 (where the attorney was denied access to the suspect and the suspect was not told of the availability of the attorney, the suspect's failure to request counsel did not support a finding of waiver of counsel); and *State v. Jones* (1978), 19 Wash. App. 850, 578 P.2d 61 (where the attorney requested that no interrogation be conducted in his absence and the police did not inform the defendant of the lawyer's availability and desire to be present, there was no knowing and intelligent waiver by defendant of his right to counsel). *People v. Smith* (1982), 93 Ill. 2d 179, 188-89, 442 N.E.2d 1325.

We reject the State's attempt in the case at bar to distinguish *Smith*. Although the defendant in *Smith* initially met with an attorney who agreed to represent him, the supreme court reasoned that the second attorney's thwarted efforts to talk to the defendant and the police officer's failure to tell the defendant that the second attorney had asked to see the defendant were reversible error and demanded a new trial.

In the pending case, defendant's attorney was not physically at the police station when he first made his request to talk to the defendant, but he testified at the pretrial hearing on the defendant's motion to suppress the defendant's statements that he asked to talk to the defendant when he spoke with Officer Meese on the telephone. Defendant's attorney told Meese that he was the defendant's attorney and that he had been asked by the defendant's wife to represent the defendant in this matter. As in *Smith*, this information was not communicated to the defendant.

We reject the State's reliance on *People v. Finklea* (1983), 119 Ill. App. 3d 448, 456 N.E.2d 680. In *Finklea*, the court held that the defendant's statements were not elicited in violation of his fifth amendment right against self-incrimination when he was not informed during a police interrogation that an attorney retained to represent him was present and wished to see him because the defendant was not in custody during the interrogation. The court held that since the defendant was not in custody, *Miranda* did not apply. Such is not the case here.

■■ With the preceding case analysis and authority as our guide, we are convinced that the State in this case failed to prove an effective waiver of counsel and that defendant's inculpatory statements should have been suppressed. Officer Meese acknowledged he had received a telephone call from defendant's attorney, Anthony Rocco, at about noon or 12:15. Rocco requested that he be notified of defendant's arrival at the station. Contrary to Meese's recollection, Rocco

explained, "I then called the Des Plaines station and I spoke—approximately one o'clock, I spoke to Investigator Meese, who—and I advised him that I was retained to represent Daniel Holland, and I requested to speak to him, himself. They told me that Holland had not come into the police station but that he was still in transit from Schiller Park."

In comparing his account with that of Officer Meese, Rocco stressed, "Now, I told Meese that I wanted him to call me, *that I did not want him to interrogate my client until I had a chance to see him and confer with him.* He said he understood it and that he would telephone me. *** I think, your Honor, it is reasonable to infer that I as an experienced criminal lawyer would not call an officer to have a lineup. I would know as a former assistant State's Attorney who had taken many confessions myself, that they would attempt to interrogate him, and try to get him to admit to this crime, and that it would be obvious for me to tell them that I wanted to talk to him before they interrogated him."

Officer Meese's recollections on other points were shown to be mistaken. He testified defendant arrived at the Des Plaines station at about 2:30 or 2:45 but Assistant State's Attorney Raphaelson and Meese himself also testified to meeting with the defendant at 2 o'clock. Meese also stated that he spoke to defendant's attorney at about noon or 12:15, but defendant's wife testified she did not hire an attorney until 12:45 or 12:50. Thus, his failure to recall that defendant's attorney expressed the desire to see the defendant before the interrogation appears further error in recollection. The State has failed to show an adequate waiver of counsel by defendant at the custodial interrogation. It was error for the trial court to deny defendant's motion to suppress his statements. That ruling must be reversed.

■■ Defendant's next contention for reversal is that his confession should not have been admitted because it was obtained by subterfuge and was therefore involuntary and inadmissible. We agree.

Assistant State's Attorneys Ira Raphaelson and Howie Freedman and Officer Meese were present during defendant's interrogation at the Des Plaines police station. Raphaelson testified at the hearing on defendant's motion to suppress his confession that the defendant gave "a false exculpatory statement" at that time and that after further conversation with the defendant, he and Freedman left the interview room. Meese remained in the room with the defendant. During this break in the interrogation, Meese continued talking to the defendant.

On cross-examination at the motion to suppress hearing, Meese testified:

"Q. And what did you say to Mr. Holland, and what did he say to you?

A. I continued questioning him relative to the crime. During my interview with the victim, she had indicated to me that while she was being forcibly raped in the alley, that a female had walked past the car. And I assumed that if Mr. Holland was involved, that he would have seen that same female. *At that time I indicated to him that we were notified by the City of Chicago that his vehicle was observed in the alley involved in a rape incident, and that he could not be identified, but that he would have to explain why the vehicle was there.* At that time he thought about that for approximately one to two minutes and voluntarily gave me a statement indicating—

Q. Was that a true statement [you] made?

A. No, it was not.

Q. So you lied to him at that point?

A. I would not use the term, 'lie.'

Q. Pardon me?

A. *I would term it more subterfuge than lie.*" (Emphasis added.)

Meese summoned Assistant State's Attorney Raphaelson back into the room and told Raphaelson that the defendant would talk to him and now tell him what really happened. Defendant then gave a confession.

The State characterized Officer Meese's statement to the defendant as "basically true." The State argues that the only part of Meese's subterfuge that may have been misleading was that the city of Chicago had notified the Des Plaines police that an unidentified person saw the defendant's car in an alley when, in fact, the State points out, the complainant *had* seen the car in the alley and identified the defendant prior to the time that the defendant gave a confession.

We reject the State's effort to elevate Meese's misrepresentation to the defendant from what Meese himself characterized as a "subterfuge," to what the State refers to as a "basically true" statement. Whether a "subterfuge," misrepresentation, fabrication, falsehood or any other descriptive term was used to identify Meese's statement to the defendant, the statement was not true. The city of Chicago had *not* notified and had *not* told the Des Plaines police that defendant's car had been observed in the alley and that he could not be identified or that the defendant would have to explain why the car was there. In fact, by virtue of the defendant's fifth and fourteenth amendment

privileges against self-incrimination, the defendant was not and could not have been required to explain why his car was anywhere at any time.

It is quite apparent that Meese made this statement to the defendant to frighten and induce him to confess. The "subterfuge" served its purpose. But a confession made under such circumstances is not freely and voluntarily given and is therefore inadmissible.

In determining whether a defendant's confession was voluntarily given, it must be ascertained whether the defendant's will was overborne at the time he confessed and whether the confession was made freely and without compulsion or inducement. As the supreme court unequivocally held in *Miranda v. Arizona* (1966), 384 U.S. 436, 476, 16 L. Ed. 2d 694, 725, 86 S. Ct. 1602, 1629, "any evidence that the accused was threatened, tricked, or cajoled into a waiver [of his fifth amendment privilege against self-incrimination] will, of course, show that the defendant did not voluntarily waive his privilege."

In *Lynumn v. Illinois* (1963), 372 U.S. 528, 9 L. Ed. 2d 922, 83 S. Ct. 917, the arresting officers misrepresented to the defendant, who had been arrested for the unlawful sale and possession of marijuana, that "if we took her into the station and charged her with the offense, that the ADC [Aid to Dependent Children] would probably be cut off and also that she would probably lose custody of her children." The confession as evidence vitiated the judgment of conviction because it violated the due process clause of the fourteenth amendment. The court stated:

> "We think it clear that a confession made under such circumstances must be deemed not voluntary, but coerced. That is the teaching of our cases. We have said that the question in each case is whether the defendant's will was overborne at the time he confessed. [Citations.] If so, the confession cannot be deemed 'the product of a rational intellect and a free will.'" 372 U.S. 528, 534, 9 L. Ed. 2d 922, 926, 83 S. Ct. 917, 920.

In *Lynumn*, the supreme court construed the officer's misrepresentation to the defendant as threats. In the case before us, Meese's misrepresentation to the defendant can likewise be so construed. Meese did not tell the defendant what would happen if the defendant failed to explain why his car was at the scene of the rape offense. Meese left that to the intimidated imagination of the defendant. Meese's misrepresentation was not only a "subterfuge," it was also a threat, as were the misrepresentations in *Lynumn*.

In *People v. Lee* (1984), 128 Ill. App. 3d 774, 471 N.E.2d 567, the defendant was convicted of raping the complainant in her apartment.

The complainant testified that the defendant was her co-employee and a social acquaintance who had previously visited her home. When the defendant was initially taken into custody he denied being in the complainant's apartment on the night of the alleged rape. The assistant State's Attorney accurately told the defendant that he had been identified as the rapist but misrepresented to the defendant that his fingerprints had been found in the complainant's apartment. The defendant then admitted that he had been in the apartment on the night that the complainant said she had been raped.

The defendant in *Lee* stated that he and the complainant were co-workers and had an ongoing sexual relationship. He admitted that on the night in question, he and the complainant embraced, went into the bedroom and undressed, that they argued and that the defendant verbally abused and treated the complainant roughly. When the complainant mentioned the name of her former lover, the defendant left the apartment when the complainant ordered him to do so. The defendant denied the rape.

Citing *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1062; *People v. Stevens* (1957), 11 Ill. 2d 21, 141 N.E.2d 33; and *People v. Gunn* (1973), 15 Ill. App. 3d 1050, 305 N.E.2d 598, this court held in *Lee* that the assistant State's Attorney's misrepresentations to the defendant that his fingerprints had been found in the complainant's apartment rendered the defendant's confession involuntary and inadmissible, necessitating reversal of the rape conviction. *People v. Lee* (1984), 128 Ill. App. 3d 774, 780, 471 N.E.2d 567; see also *Spano v. New York* (1959), 360 U.S. 315, 3 L. Ed. 2d 1265, 79 S. Ct. 1202 (where a misrepresentation to the defendant that his police friend's job would be jeopardized if the defendant did not confess was one of the factors on which the supreme court relied in holding that the defendant's confession was involuntary).

We hold that because Officer Meese made a knowing misrepresentation to the defendant, the defendant's confession was improperly obtained by subterfuge, was involuntary, not freely given and was inadmissible. The trial court erred in denying the defendant's motion to suppress his confession.

■■ Defendant also urges that his conviction for armed robbery should be reversed because, he contends, the evidence failed to establish that he obtained the complainant's property with force, an element necessary for an armed-robbery conviction. According to defendant, although he warned the victim that he would "knock her out," that threat had no bearing on his obtaining the victim's property. Instead, defendant maintains, the force he exerted was used in commit-

ting the sexual offenses and not to obtain the victim's property. We disagree.

Armed robbery is defined as the taking of property from the person or presence of another by the use of force or by threatening the imminent use of force while armed with a dangerous weapon. (Ill. Rev. Stat. 1981, ch. 38, par. 18—2; *People v. Ditto* (1981), 98 Ill. App. 3d 36, 424 N.E.2d 3.) In an armed-robbery offense, the requirement that the force be used to take property from another is satisfied if the fear of the victim was of such nature as in reason and common experience is likely to induce a person to part with his property. *People v. Dates* (1981), 100 Ill. App. 3d 365, 426 N.E.2d 1033.

In the pending case, immediately before the defendant took the complainant's property, the defendant threatened the complainant with imminent force. Defendant stated to the complainant, while armed with a knife, that he was going to knock the complainant unconscious. The complainant was afraid and parted with her property because of these threats and her fear. The complainant's fear for her physical safety, which was reasonably based on the defendant's continuing threat of the imminent use of force to do bodily harm to her, was sufficient to induce her to part with her property—her driver's license, money and high school identification card.

■ Also, after the final sexual assault, defendant still brandished a knife. The evidence clearly established that the complainant was threatened by the defendant with the imminent use of force and that the defendant, while armed with a dangerous weapon, acquired the complainant's property.

Our disposition of this issue is persuaded by *People v. Pavic* (1982), 104 Ill. App. 3d 436, 432 N.E.2d 1074. In *Pavic*, after illegally entering the victim's apartment and hiding in a bedroom closet, the defendant grabbed the victim's throat, choked her, and told her to stop screaming or he would stab her. The defendant also demanded money, which the victim said was in her purse. The defendant raped the victim twice. Thereafter, he went into the living room and took the victim's money and record albums.

The defendant argued that his conviction for robbery should be reversed because the force involved in the rape could not be imputed to the taking of the victim's property. The court's reasoning in *Pavic* is relevant to the determination we must make in the instant case. The court stated:

"Here, it has been proved beyond a reasonable doubt that defendant exerted brutal force against G.S. when he grabbed her and choked her and raped her. It cannot seriously be con-

tended that the victim was not subdued by defendant's actions.
\*\*\*

   \*\*\*

   \*\*\* [T]he present case involves evidence that defendant demanded money from G.S. at the beginning of the attack. The jury could well have inferred that he intended to rob her all along. After choking and raping her, moreover, defendant hardly had reason to anticipate any further resistance; his force against her remained in effect. Therefore, we hold that since defendant's use of force was not limited to the sexual assault and thus satisfies the robbery statute, defendant's robbery conviction must be affirmed." *People v. Pavic* (1982), 104 Ill. App. 3d 436, 445-46, 432 N.E.2d 1074.

In the case before us, defendant's reliance on *People v. King* (1979), 67 Ill. App. 3d 754, 384 N.E.2d 1013, which affirmed the defendant's rape conviction but reduced the defendant's robbery conviction to theft, is misplaced. As the court pointed out in *King*:

"[T]he evidence revealed that the rape occurred in the bedroom and that the purse was taken from the kitchen. The testimony established that the distance between these two points was approximately 15 to 30 feet. *Nowhere in the record is there any indication that the purse was taken from the presence of the victim* with the use of force as required by the robbery statute." (Emphasis added.) 67 Ill. App. 3d 754, 759, 384 N.E.2d 1013.

The defendant's reliance on *People v. Pack* (1976), 34 Ill. App. 3d 894, 341 N.E.2d 4, which affirmed the defendant's attempted-murder conviction but vacated his robbery conviction, is likewise misplaced. As the court in *Pack* stated:

"Defendant looked through a window of the victim's house and saw her asleep. He then entered the house, choked her until he thought she was dead, took money from her purse, lying on a nearby chair, and fled. We believe that, although the facts adequately supported the attempt conviction, no factual basis was established to support the robbery charge. *Force was used against the victim with the intent to kill, not to steal. The subsequent taking of property, apparently an afterthought, established only theft* \*\*\*." (Emphasis added.) 34 Ill. App. 3d 894, 899, 341 N.E.2d 4.

In the case at bar, the force defendant used against the complainant in committing the sexual offenses and the complainant's fear occasioned thereby were in effect and present when the defendant took

her property. The jury therefore had sufficient evidence to find beyond a reasonable doubt that the defendant committed the armed-robbery offense.

Defendant's remaining issues are: (1) the extended term sentence for aggravated kidnaping was erroneous and should be "replaced" because it was not the most serious offense for which defendant was convicted; (2) the consecutive sentence for armed robbery was improper and should be vacated or made concurrent because the offense was part of a single course of conduct; and (3) the order that the sentences "shall be served consecutive to any parole violations" is too broad and indefinite to be valid.

The applicable section of the extended-term statute provides:

"A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a).)

Section 5—5—3.2(b) states:

"[T]he following factors may be considered by the court as reasons to impose an extended term sentence under Section 5—8—2 upon any offender who was at least 17 years old on the date the crime was committed:

(1) When a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater class felony, within 10 years, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts; or

(2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty; or

(3) When a defendant is convicted of any felony committed against:

(i) a person under 12 years of age at the time of the offense;

(ii) a person 60 years of age or older at the time of the offense; or

(iii) a person physically handicapped at the time of the offense." Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b).

In the case before us, the trial court stated in sentencing the defendant:

"[I]n imposing sentence, I've considered not only the evidence I have referred to and I've considered, but in particular

that on this particular occasion, on May 4, 1980, the defendant, with a knife, kidnapped [the complainant] from the street. She sought his assistance with her friend because their automobile had broken down. He took them in his car and he held out a hand. They thought he was, in fact, an off-duty police officer. That's what he extended himself to be.

\* \* \*

He [defendant] terrorized the complaining witness by threatening to kill her and members of her family if she should, in fact, go to the police.

And I, therefore, find that mental anguish and a strong possibility of impending death was upon the complaining witness throughout these entire proceedings; during the time she was with the defendant for one-and-a-half hours.

And therefore, this Court finds that the offenses of rape, deviate sexual assault and aggravated kidnapping were accompanied by exceptionally brutal and heinous behavior, indicative of wanton cruelty."

Thus, the trial judge held that the defendant's threat to kill the complainant and members of her family created "mental anguish and a strong possibility of impending death" and was exceptionally brutal and heinous behavior indicative of wanton cruelty. We do not decide whether a defendant's threat to kill a victim constitutes exceptionally brutal and heinous behavior indicative of wanton cruelty.

The defendant further contends that the trial court erred in sentencing him to a consecutive term of imprisonment for armed robbery. Section 5—8—4(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—4(a)) provides:

"When multiple sentences of imprisonment are imposed on a defendant at the same time \* \* \* the sentences shall run concurrently or consecutively as determined by the court. \* \* \* The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively. Sentences shall run concurrently unless otherwise specified by the court."

The trial court expressly found:

"The armed robbery took place in the City of Chicago after the rapes had been completed. This was, in fact, a substantial

change in the nature of the defendant's original objectives, and for that reason I made those express findings. *The armed robbery was not—again, was not a part of the defendant's original objective. His original objective was for sexual gratification and the armed robbery was not.* Therefore, the armed robbery was a distinctive objective and a distinctive offense." (Emphasis added.)

Other than as above noted, the trial court neglected to specify on what evidence it based its finding that "the defendant's original objective was for sexual gratification and the armed robbery was not," or that the initial purpose of the kidnaping was for sexual gratification.

Although the evidence clearly established that the sexual offenses were the initial offenses committed, the evidence did not establish that those sex offenses were the defendant's exclusive purpose of kidnaping the complainant.

Finally, the defendant contends that the order that "all of these sentences shall be served consecutive to any parole violations" is too indefinite and ambiguous and is therefore invalid. The defendant relies on what he characterizes as the "erroneous order" in *People v. George* (1979), 75 Ill. App. 3d 140, 393 N.E.2d 1182, where the court imposed a sentence of 364 days "to run consecutive with any now pending sentence or any such further sentence received by virtue of a parole violation."

The State in *George* conceded that the sentence was improper under *People v. Walton* (1969), 118 Ill. App. 2d 324, 254 N.E.2d 190, and agreed that the cause should be remanded for resentencing. The court in *Walton* stated:

" 'Such language is so broad that it may be said to make this sentence consecutive to other sentences not in the present record. A sentence should be so complete as not to require construction by the court to ascertain its import, and so complete that it will not be necessary for a nonjudicial or ministerial officer to supplement the written words to ascertain its meaning.' " *People v. George* (1979), 75 Ill. App. 3d 140, 144, 393 N.E.2d 1182, quoting *People v. Walton* (1969), 118 Ill. App. 2d 324, 333, 254 N.E.2d 190.

Our supreme court held in *People v. Toomer* (1958), 14 Ill. 2d 385, 152 N.E.2d 845, which was also cited in *George*, that:

"[A] sentence of imprisonment to take effect in the future as cumulative punishment upon the termination of another sentence must be of such certainty that the commencement of the second and the termination of the first sentence may be ascer-

tained from the record." *People v. George* (1979), 75 Ill. App. 3d 140, 144, 393 N.E.2d 1182, citing *People v. Toomer* (1958), 14 Ill. 2d 385, 387, 152 N.E.2d 845.

In the case before us, the State urges that the trial court's sentence is valid under *People v. Starnes* (1980), 88 Ill. App. 3d 1141, 411 N.E.2d 125, where the trial court stated in imposing sentence:

"Now, this is to be served consecutively to any prior convictions from this Court in 75—CF—231, and 76—CF—26. If your parole has run out you will just have to serve the three years with a day off for every day served for good behavior. If it has not run out then they will add that on."

The court in *Starnes* relied on *People v. Ferguson* (1951), 410 Ill. 87, 91, 101 N.E.2d 522, *cert. denied* (1952), 343 U.S. 910, 96 L. Ed. 1327, 72 S. Ct. 643, which held that the validity of a judgment is not conditioned upon the choice of the most felicitous mode of expression.

Because we reverse the defendant's convictions and remand for a new trial, we do not decide the validity of the sentences imposed or whether defendant was denied effective assistance of counsel. The remaining issues raised by defendant do not merit discussion.

Reversed and remanded.

MURRAY*, J., concurs.

JUSTICE SULLIVAN, dissenting:

The majority opinion reverses on conclusions that defendant's confession should have been suppressed (a) because he did not waive his right to counsel during the custodial interrogation when the confession was obtained and (b) because the confession was improperly obtained through a subterfuge by Officer Meese. I disagree with both conclusions.

The majority first concludes that there was no waiver of defendant's right to counsel "because the police did not tell him that his attorney was trying to reach him." In reaching this conclusion the majority opinion relies entirely on "testimony" of defense attorney Rocco that he told Officer Meese that he wanted to speak to defendant. However, Rocco gave no such testimony.

At the hearing on the motion to suppress, Assistant State's Attor-

---

*Justice Mejda heard the oral argument in this case and following his retirement, Justice Murray was substituted, listened to the tapes of oral argument and read the briefs and record.

ney Raphaelson, who was an assistant United States Attorney at the time of trial, testified that he did not talk to Attorney Rocco until 3 p.m. on May 4, which was after defendant's confession, and that prior thereto Raphaelson did not know that any attorney was trying or had attempted to reach defendant. Officer Meese testified that Attorney Rocco telephoned between noon and 12:15 p.m. on May 4 and requested only that he be notified when defendant was transferred to the Des Plaines station for a lineup and that he (Meese) called Rocco between 2:30 and 2:45 p.m. that day to inform him of the lineup but Rocco was not at home. Meese also testified that he was not told by Rocco or anyone else that Rocco wanted to speak to defendant. At the hearing, Rocco testified that he came to the Des Plaines station at 3:45 p.m. on May 4, which was after the confession, and that he was permitted to see defendant at that time. Rocco gave no testimony, as stated in the majority opinion, that he told Meese or anybody else at any time before the confession was given that he wanted to speak to defendant. In fact, no one gave any testimony at the hearing contradicting that of Raphaelson and Meese as set forth above.

The record does show that in his interrogation of Meese during the hearing to suppress the confession Rocco asked whether he (Rocco) told him in the telephone conversation on May 4 that he wanted to speak to defendant but Rocco did not testify to any such statement. The majority considered this questioning and a comment made by Rocco in his argument as testimony by him in reaching the conclusion that there was no waiver of counsel by defendant because his counsel was not permitted to speak with him. The conclusion is unsupportable.

The conclusion is also improper under *Moran v. Burbine* (1986), 475 U.S. ___, 89 L. Ed. 2d 410, 106 S. Ct. 1135, where the supreme court held that so long as defendant himself validly waived his right to counsel his statement to the police was admissible even though they would not allow an attorney hired by defendant's sister to contact him. After his initial arrest for breaking and entering, Burbine was informed of his *Miranda* rights, but he refused to sign a waiver of counsel at that time. The police did not again question him for almost five hours, during which period others who had been arrested with Burbine implicated him in a murder. Within that five-hour interval, a lawyer from the office of the public defender, in response to a call from defendant's sister, informed the police by telephone that he would act as Burbine's attorney if he were questioned or was included in a lineup. The police did not inform Burbine of the call and subsequently, after *Miranda* warnings, undertook three separate interroga-

tions of him, after each of which he signed waivers of his rights and gave written statements which were used at the murder trial.

It was held in *Burbine* that the conduct of the police in thwarting the efforts of counsel to contact him did not undermine the validity of the otherwise proper waiver of his right to counsel. The court stated, in pertinent part, that such deception "could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident." *Moran v. Burbine* (1986), 475 U.S. ___, ___, 89 L. Ed. 2d 410, 422, 106 S. Ct. 1135, 1142.

The majority here, while agreeing that under *Burbine* there would be a valid waiver in the instant case, relies instead upon *People v. Smith* (1982), 93 Ill. 2d 179, 442 N.E.2d 1325, in finding that there was not a waiver. In *Smith*, following defendant's arrest he met with a private attorney who agreed to represent him and later the same day the attorney's associate went to the jail where defendant was detained but was denied access to him. The court held that there could be no knowing waiver of the right to counsel "if the suspect has not been informed that the attorney was present and seeking to consult with him." *People v. Smith* (1982), 93 Ill. 2d 179, 189, 442 N.E.2d 1325.

I view *Smith* as being inapplicable because (a) at the time of his confession defendant here had not retained an attorney and did not know that his sister had contacted Rocco; (b) no attorney had presented himself or herself at any place where defendant was detained and (c) there is no testimony in the record that any attorney had ever sought to speak or consult with defendant prior to his confession. See *People v. Owens* (1984), 102 Ill. 2d 88, 100, 464 N.E.2d 261; *People v. Martin* (1984), 102 Ill. 2d 412, 424, 466 N.E.2d 228 (*Smith* inapplicable where there was no indication in the record that any attorney attempted to confer with defendant prior to his confession).

I disagree also with the majority's other conclusion in reversing that the court erred in denying the motion to suppress defendant's confession because "Officer Meese made a knowing misrepresentation to defendant, the defendant's confession which was improperly obtained by subterfuge, was involuntary, not freely given and was inadmissible." As stated in the majority opinion, Meese admitted at the hearing on the motion to suppress that he made an untrue statement to defendant that the police had been notified by the city of Chicago that his car had been seen in the alley where the crimes occurred and that, while he could not be identified, he would have to explain why his car was there. Solely on the basis of this statement by Meese the majority finds that defendant's confession was not freely and volun-

tarily given.

It is difficult to understand how the majority makes this finding since (a) defendant in his testimony made no mention of any statement by Meese that his car was seen in the alley where the crimes occurred; (b) defendant did not testify that any such statement by Meese or any other statement by anyone induced, coerced or influenced him in any manner to give his confession; (c) the confession was not given to Meese but to the two assistant State's Attorneys, Raphaelson and Freedman, and there is nothing in the record which even remotely suggests that either said or did anything to influence the confession; and (d) defendant's counsel did not contend at any time in the trial court that Meese's statement coerced or influenced in any manner defendant's confession.

In fact, the record discloses that the only question asked of defendant at the hearing on the motion to suppress concerning the reason he gave the confession was by his attorney as follows: "Now did you confess once you were—because you were hurt?" and defendant answered "Yes I wanted people to leave me alone." Moreover, it is noted that the trial court found, in denying the motion to suppress the confession of defendant, that "his will was not overborne and he acted without any compulsion or any inducement of any sort whatsoever, and he received his rights, and he acted freely and voluntarily and intelligently when he made the statements."

Under these circumstances, where its conclusion is based solely upon the statement made by Meese to defendant and neither defendant nor his attorney stated or gave any indication in the trial court that the statement in any way influenced his confession, the finding of the majority that the confession was not freely or voluntarily given because of Meese's statement is unjustified.

For the reasons stated, I find that there is no support in the record here for the conclusions of the majority in reversing the convictions.