**Daniel HOLLAND, Petitioner–Appellee,**

v.

**Kenneth McGINNIS, Warden, and Michael P. Lane, Director, Illinois Department of Corrections, Respondents–Appellants.**

**No. 91–1553.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1991.

Decided May 14, 1992.

Donald S. Honchell, argued, Office of the Cook County Public Defender, Chicago, Ill., for petitioner-appellee.

Roland W. Burris, Office of the Atty. Gen., Terence M. Madsen, Jack Donatelli, Asst. Attys. Gen., Kathryn M. Frost, Steven J. Zick, argued, Office of the Atty. Gen., Criminal Appeals Div., Chicago, Ill., for respondents-appellants.

Before WOOD, Jr.,* and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

FLAUM, Circuit Judge.

The state appeals from the district court's grant of Daniel Holland's petition for a writ of habeas corpus.

A Cook County jury convicted Holland of deviate sexual assault, rape, armed robbery, and aggravated kidnapping, and the trial judge sentenced him to a lengthy prison term. The Illinois appellate court determined that Holland's confession, which the prosecution introduced at trial, had been coerced, and reversed the convictions. *People v. Holland*, 147 Ill.App.3d 323, 100 Ill.Dec. 868, 497 N.E.2d 1230 (1986). The Illinois Supreme Court reversed in turn, finding that Holland's confession was voluntary and rejecting Holland's other con-

tentions. *People v. Holland*, 121 Ill.2d 136, 117 Ill.Dec. 109, 520 N.E.2d 270 (1987). Holland, who is white, sought certiorari in the United States Supreme Court on the sole ground that the prosecution had violated his sixth amendment rights by discriminatorily exercising its peremptory challenges to exclude black venirepersons from the petit jury. The Court granted certiorari, 489 U.S. 1051, 109 S.Ct. 1309, 103 L.Ed.2d 579 (1989), and affirmed on the ground that the sixth amendment's fair cross-section requirement does not extend to the petit jury. *Holland v. Illinois*, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990). Nonetheless, the Court indicated, through concurring and dissenting opinions representing the views of five Justices, that Holland may have prevailed had he advanced his claim under the equal protection clause as interpreted by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Holland then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The district court, in a thoughtful opinion, granted the writ on two grounds. 754 F.Supp. 1245 (N.D.Ill.1990). First, it held that Holland's confession had been physically coerced and obtained through subterfuge, that admitting it at trial had violated his rights under the fifth and fourteenth amendments, and therefore that Holland was entitled to a new trial. *Id.* at 1255–59. In the alternative, the court held that the state's alleged discriminatory use of its peremptory challenges violated Holland's equal protection rights under *Batson*, that a federal habeas court's application of *Batson* in a cross-racial context did not violate the retroactivity principles of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and therefore that Holland was entitled to a *Batson* evidentiary hearing to prove his allegations. 754 F.Supp. at 1250–55. We reverse.

## I.

We first examine the propriety of admitting Holland's confession at trial. Actually, Holland twice confessed to the crimes of

---

* Judge Wood, Jr., assumed senior status on January 16, 1992, after oral argument in this case.

which he was ultimately convicted—first to police officers in the Schiller Park police station, and again about six hours later to a state prosecutor in the Des Plaines police station. The state trial judge suppressed the Schiller Park confession on the ground (perhaps, *see* Section II.A *infra*) that it had been physically coerced; the admissibility of that confession is not at issue here. The trial judge nonetheless admitted, over Holland's objection, the Des Plaines confession, which Holland tendered after waiving his *Miranda* rights. Holland has properly preserved his objection to the admissibility of this second confession on direct and collateral review. The district court ruled that the Des Plaines confession had been coerced (or, more accurately, that Holland's waiver of his *Miranda* rights had been coerced), and hence inadmissible. 754 F.Supp. at 1255–59. It is this ruling that the state appeals.

Before proceeding, we provide the necessary factual background. The crimes underlying Holland's conviction have been described in detail by the Illinois appellate court, *Holland,* 100 Ill.Dec. at 870, 497 N.E.2d at 1232–33, the Illinois Supreme Court, *Holland,* 117 Ill.Dec. at 114–15, 520 N.E.2d at 275–76, and the district court, 754 F.Supp. at 1246–47, so we need only briefly summarize here. On May 4, 1980, slightly after midnight, the victim and her boyfriend were driving home from a party when they realized that their car had a flat tire. They pulled over, went to sleep, awoke at dawn, and began to walk along the shoulder of the road to seek assistance. Holland, who was driving along the same road, spotted the couple and offered them a ride home, which they accepted. Shortly thereafter, Holland stopped the car, brandished a knife against the victim's throat, and ordered the boyfriend out of the car. Holland then drove away, pulled into a parking lot, and forced the victim to perform an act of oral sex on him. He subsequently drove to an alley, where he twice raped her and once again forced her to perform oral sex. Holland finally released the victim with a warning that he would kill her if she reported the incident to the police.

The Schiller Park police arrested Holland, who was in possession of the victim's high school identification card and other incriminating evidence, at 8:15 a.m. that same morning. It is undisputed that Holland sustained numerous injuries while in their custody. At the suppression hearing before the state trial court, Holland attributed his injuries to a beating administered by the Schiller Park police; he testified that they "kicked, hit, and knocked [him] to the ground, punched and beat[ ] [him] with a nightstick, raised [him] off the floor by elevating his handcuffed arms behind him, and [pulled] his hair." *Holland,* 117 Ill. Dec. at 126, 520 N.E.2d at 287 (Simon, J., dissenting). The record does not reflect whether the Schiller Park police explicitly refuted this testimony, but the fact that they filed charges against Holland for aggravated battery indicates to us that they believed, or wanted others to believe, that Holland instigated the physical encounter. Holland tendered the Schiller Park confession either during or shortly after his alleged beating. Sometime after noon, a Des Plaines police officer transported Holland from Schiller Park to the Des Plaines police station. The officer and two state prosecutors questioned him there—the Schiller Park officers who allegedly beat him were not present—and at 2:30 p.m. Holland delivered the Des Plaines confession to one of the prosecutors.

The state trial judge, in suppressing the Schiller Park confession, reasoned as follows:

> [T]here is no question that some degree of confrontation took place in Schiller Park because the officers in those cases are complainants, and there is no question that the defendant apparently sustained some injury. Whether or not he sustained those in being apprehended ..., or whether he was beaten shall be for me to weigh upon, but there was a physical confrontation between the Schiller Park police officers and the defendant. Under the circumstances, when it was that this occurred, it is not really necessary for me to make a determination.

I find, and I do find inasmuch as there was a physical, apparently very physical confrontation from that night, [the police] had obtained leave and obtained a complaint, and have filed informations alleging aggravated battery.

\* \* \* \* \* \*

I feel that that degree of physical confrontation contaminates any statements defendant would have made at the Schiller Park Police Station, and accordingly any statements made relevant to this cause made by the defendant in the Schiller Park Police Station are hereby suppressed, and suppressed in toto.

*Holland*, 100 Ill.Dec. at 874, 497 N.E.2d at 1236 (quoting suppression hearing transcript). In admitting the Des Plaines confession, the judge explained that any contamination from the Schiller Park incident had dissipated in the interim.

The Illinois Supreme Court agreed with the trial judge's finding that Holland had voluntarily delivered the Des Plaines confession, but, unlike the trial judge, did *not* do so on the ground that any taint from the Schiller Park episode had dissipated. Rather, the Court maintained that there was "no coercion available to infect" the Des Plaines interrogation in the first instance because "there was no affirmative showing that the defendant was beaten by Schiller Park police." *Holland*, 117 Ill.Dec. at 118, 520 N.E.2d at 279. The trial judge, according to the Court, "did not find that the defendant had been beaten [in Schiller Park] but, rather, that there had been some sort of 'physical confrontation.'" *Id.*

The district court emphatically rejected the Illinois Supreme Court's factual characterization, stating that "there can be no doubt that Holland was beaten at the Schiller Park police station." 754 F.Supp. at 1256.[1] It then went on to hold that the lingering effects of that beating, along with subterfuge employed by state officials in Des Plaines, rendered the Des Plaines confession involuntary. The district court's ruling raises two issues: first, whether the Des Plaines confession was in fact coerced under prevailing constitutional standards, and, second, whether the district court erred by not deferring to the Illinois Supreme Court's finding of fact (*i.e.*, that there had been no beating) under 28 U.S.C. § 2254(d). We consider the second question first, for its resolution bears heavily upon our examination of the coercion issue.

### A.

The state argues that the district court, by finding that the Schiller Park police beat Holland, ran afoul of 28 U.S.C. § 2254(d), which provides that a state court's findings of fact "shall be presumed to be correct" in a federal habeas proceeding. This presumption applies to facts, such as "the length and circumstances of [an] interrogation" or whether "the police engaged in the intimidation tactics alleged by the defendant," that underlie a state court's legal ruling. *Miller v. Fenton*, 474 U.S. 104, 112, 117, 106 S.Ct. 445, 450, 453, 88 L.Ed.2d 405 (1985).[2] The factual findings of both state trial and appellate courts are accorded equal deference under § 2254(d). *Sumner v. Mata*, 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981). The statute carves eight exceptions to this presumption; the one relevant here, § 2254(d)(8), permits a federal habeas court to overturn a state court's factual finding if that finding "is not fairly supported by the record."

---

1. Recall that the United States Supreme Court did not pass on this issue because Holland did not present it in his petition for certiorari.

2. As it is currently interpreted, § 2254(d) does not apply to a state court's ultimate legal determination of whether, given those facts, a suspect's confession was voluntary; this determination is a question of law warranting *de novo* federal review. *Miller*, 474 U.S. at 112, 106 S.Ct. at 450. The United States Supreme Court, however, may have indicated its willingness to revisit the issue in *West v. Wright*, 931 F.2d 262 (4th Cir.1991), *cert. granted*, —— U.S. ——, 112 S.Ct. 656, 116 L.Ed.2d 748 (1991), where it ordered the parties, *sua sponte*, to brief and argue the question of whether a federal habeas court must "give deference to the state court's application of law to the specific facts of the petitioner's case or should ... review the state court's determination *de novo*." —— U.S. ——, 112 S.Ct. 672, 116 L.Ed.2d 762 (1991).

■ The district court, relying upon § 2254(d)(8), ruled that the Illinois Supreme Court's finding "contradicts the factual findings of the state trial judge." 754 F.Supp. at 1256 n. 5. That such a contradiction occurred is not entirely clear from the record. The trial judge did not explicitly declare that the Schiller Park police had beaten Holland, but only that "there had been some sort of 'physical confrontation.'" *Holland*, 117 Ill.Dec. at 118, 520 N.E.2d at 279. While a reasonable observer might conclude that the trial judge, in all probability, used "physical confrontation" as a polite euphemism for "unprovoked and/or excessive beating," the term "physical confrontation" is facially ambiguous; it conceivably could mean some physical encounter short of an actual beating, or, as the Illinois Supreme Court implied, an encounter where the police reasonably responded to a violent outburst by Holland. *See id.* (emphasizing that two Schiller Park police officers filed charges against Holland for aggravated battery). When a state appellate court, confronted with a facially ambiguous trial court statement, adopts one of two possible interpretations, a federal habeas court must abide by that choice, *Wainwright v. Goode*, 464 U.S. 78, 83–85, 104 S.Ct. 378, 381–83, 78 L.Ed.2d 187 (1983); *Dooley v. Duckworth*, 832 F.2d 445, 449 (7th Cir.1987), *cert. denied*, 485 U.S. 967, 108 S.Ct. 1239, 99 L.Ed.2d 438 (1988), so long as no record evidence extrinsic to the statement renders implausible the state court's interpretation. *Parker v. Dugger*, —— U.S. ——, 111 S.Ct. 731, 737–38, 112 L.Ed.2d 812 (1991).

Hence, were there no evidence in the record shedding additional light upon what the trial judge meant by "physical confrontation," we would end our inquiry and conclude that the district court erred by slighting the Illinois Supreme Court's finding of fact. However, the trial judge did not use the term in a vacuum, but rather in a particular legal context, and a federal habeas court must pay heed to that context under § 2254(d)(8). *See Parker*, 111 S.Ct. at 737–38 (where state trial court, in the absence of statutory mitigating circumstances, sentenced defendant to death for

one murder and to life imprisonment for a contemporaneous murder, only reasonable explanation is that court believed in the presence of nonstatutory mitigating circumstances, despite the fact that it did not make explicit in the record any finding to that effect); *cf. Marshall v. Lonberger*, 459 U.S. 422, 433–34, 103 S.Ct. 843, 850–51, 74 L.Ed.2d 646 (1983) (where Ohio trial court admitted into evidence defendant's record of conviction from Illinois, only explanation is that court rejected defendant's testimony that Illinois guilty pleas were involuntary); *Andersen v. Thieret*, 903 F.2d 526, 530 (7th Cir.1990) ("where a habeas petitioner's story would have led the state trial court to conclude the petitioner's confession was involuntary, the state court's finding of voluntariness implies that petitioner's version of the facts was rejected"). Here, the fact that the trial judge suppressed the Schiller Park confession suggests, perhaps strongly, that it meant "physical confrontation" to signify something far more sinister than the interpretation offered by the Illinois Supreme Court. After all, why suppress in the absence of impermissible coercion? In light of the trial court's legal ruling, the Illinois Supreme Court's factual finding that the Schiller Park police did not beat Holland appears quite dubious, while the district court's finding to the contrary appears correct.

But perhaps not. The Illinois Supreme Court explained the anomaly between its factual finding and the trial court's legal ruling by stating that the trial court "gave [Holland] the benefit of any doubt [by] suppress[ing] all statements made while in custody of the Schiller Park police." *Holland*, 117 Ill.Dec. at 118, 520 N.E.2d at 279. We question whether *that* statement constitutes a "factual finding" within the meaning of § 2254(d). It is pure conjecture, and furthermore is at odds with the presumption that state courts apply federal constitutional standards fairly and accurately, not with an eye toward favoring either party. *See Stone v. Powell*, 428 U.S. 465, 493 n. 35, 96 S.Ct. 3037, 3052 n. 35, 49 L.Ed.2d 1067 (1976). Nonetheless, the

Court's statement is plausible; the trial judge, having decided to admit the Des Plaines confession and in the interest of judicial economy, may have calculated that suppressing the Schiller Park confession would eliminate a potentially nettlesome (and, at the time, *per se* reversible) issue on appeal at little practical detriment to the state's case at trial.

The issue posed is a close one. We decline to resolve it here, for even assuming that the district court properly employed § 2254(d)(8) to find that the Schiller Park police beat Holland, we find, pursuant to the following discussion, that the beating did not render involuntary Holland's Des Plaines confession.

## B.

■ A confession is "involuntary" or "coerced" if the "totality of the circumstances" demonstrates that the confessor did not make the decision to confess of his own free will. *Arizona v. Fulminante*, — U.S. —, 111 S.Ct. 1246, 1251–52, 113 L.Ed.2d 302 (1991). Our consideration of this issue is plenary; under prevailing constitutional standards, we review *de novo* both the Illinois Supreme Court's legal ruling that Holland voluntarily tendered the Schiller Park confession, *Miller*, 474 U.S. at 112, 106 S.Ct. at 450; *see* note 1 *supra*, and the district court's legal ruling that he did not. *Pharr v. Gudmanson*, 951 F.2d 117, 120 (7th Cir.1991).

■ It is axiomatic that a confession extracted with violence or the threat of violence is involuntary. *Miller*, 474 U.S. at 109–110, 106 S.Ct. at 449; *Brown v. Mississippi*, 297 U.S. 278, 285–87, 56 S.Ct. 461, 464–65, 80 L.Ed. 682 (1936). However, the (assumed) fact that the police beat a confession out of Holland in Schiller Park "does not permanently disable him from giving a voluntary statement" at a later time. *Wilson v. O'Leary*, 895 F.2d 378, 385 (7th Cir.1990); *see also United States*

*v. Bayer*, 331 U.S. 532, 540–41, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1947). Holland does not allege on appeal that officers at the Des Plaines station mistreated or threatened him, and his confession there followed the Schiller Park confession by about six hours. As such, voluntariness depends in large part upon whether there was a "break in the stream of events ... sufficient to insulate" the second confession from the earlier taint. *Clewis v. Texas*, 386 U.S. 707, 710, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967). This question, in turn, depends upon a number of subsidiary factors, including "the time that passe[d] between confessions, the change in the place of interrogations, and the change in identity of the interrogators." *Oregon v. Elstad*, 470 U.S. 298, 310, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985); *see also Robinson v. Percy*, 738 F.2d 214, 221 (7th Cir.1984); *Holleman v. Duckworth*, 700 F.2d 391, 396 (7th Cir.), *cert. denied*, 464 U.S. 834, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983). Also relevant is whether Holland received renewed Miranda warnings, whether he remained in custody following the first confession and through the second, whether he was denied access to counsel, and whether he initiated contact with authorities before his second confession. *Robinson*, 738 F.2d at 221; *Holleman*, 700 F.2d at 396.

■ We find, under the circumstances of this case, that the taint from Holland's Schiller Park beating and confession had substantially dissipated by the time he confessed in Des Plaines. True, Holland remained in custody throughout, did not speak with counsel prior to confessing in Des Plaines,[3] and did not initiate conversation with the authorities there. Nonetheless, the authorities had eliminated the most coercive elements of the Schiller Park episode before Holland tendered his second confession. First, they transferred him from Schiller Park, the site of the alleged beating, to Des Plaines. Second, and even

---

**3.** Holland's attorney tried to contact him in the Des Plaines police station, but the state officials there did not inform Holland of that fact. Holland, however, never asked to see an attorney, *Holland*, 117 Ill.Dec. at 113, 520 N.E.2d at 274, and consequently the officials' failure to tell Holland that an attorney wished to see him does not bear upon the validity of his confession. *Moran v. Burbine*, 475 U.S. 412, 422–23, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

more significant, the officers who mistreated Holland in Schiller Park were not present during the Des Plaines interrogation; two state prosecutors and a new police officer—the officer who transported him from Schiller Park to Des Plaines—interrogated Holland there after giving him renewed *Miranda* warnings. Finally, approximately six hours passed between the alleged mistreatment in Schiller Park and Holland's second confession, providing a meaningful interlude given the change of locale and custodians. Any threat of physical mistreatment had faded considerably in the interim; Holland must have recognized the difference between Schiller Park and Des Plaines in terms of atmosphere and the treatment accorded him by his interrogators. *Cf. Wilson*, 895 F.2d at 385 (coercion attenuated when interrogators, and manner and place of interrogation changed); *Lyons v. Oklahoma*, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944) (same). This is not to say that the contamination from Schiller Park had completely disappeared, but rather that, due to the "break in the stream of events," the contamination was not sufficient, by itself, to render involuntary the Des Plaines confession.

Holland also argues that subterfuge employed by the Des Plaines police officer constitutes another factor weighing against the validity of the confession. After the two prosecutors left the interrogation room, the officer told Holland that the department had received a Chicago police report indicating that a witness had seen Holland's vehicle in the alley where the victim had been raped, and that Holland would have to explain why his vehicle was there. *Holland*, 117 Ill.Dec. at 112, 520 N.E.2d at 273. In fact, the Chicago police had made no such report. Holland confessed to one of the two prosecutors soon after he reentered the interrogation room.

 The fact that the officer misrepresented to Holland the strength of the evidence against him, while "insufficient [by itself] to make [an] otherwise voluntary confession inadmissible," is one factor to consider among the totality of circumstances in determining voluntariness. *Fra-*

*zier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969). Of the numerous varieties of police trickery, however, a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary. *See* Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 6.2(c), at 446–48 (1984); *United States v. Velasquez*, 885 F.2d 1076, 1088–89 & n. 11 (3d Cir.1989), *cert. denied*, 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990). Such misrepresentations, of course, may cause a suspect to confess, but causation alone does not constitute coercion; if it did, all confessions following interrogations would be involuntary because "it can almost always be said that the interrogation caused the confession." *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). Thus, the issue is not causation, but the degree of improper coercion, and in this instance the degree was slight. Inflating evidence of Holland's guilt interfered little, if at all, with his "free and deliberate choice" of whether to confess, *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986), for it did not lead him to consider anything beyond his own beliefs regarding his actual guilt or innocence, his moral sense of right and wrong, and his judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime. In other words, the deception did not interject the type of extrinsic considerations that would overcome Holland's will by distorting an otherwise rational choice of whether to confess or remain silent.

By way of contrast, consider the brand of police trickery the Supreme Court considered inherently coercive in *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). In that case, the police told a female suspect that she was in jeopardy of losing welfare benefits and custody of her children, but offered to recommend leniency if she would confess. *Id.* at 533–34, 83 S.Ct. at 920. Unlike the tactic employed during Holland's interrogation, this particular deceptive practice did more than affect the suspect's beliefs regarding her

actual guilt or innocence, and judgments regarding the evidence connecting her to the crime. It also distorted the suspect's rational choice (*i.e.*, is it wise or morally right to confess given the aforementioned beliefs and judgments?) by introducing a completely extrinsic consideration: an empty but plausible threat to take away something to which she and her children would otherwise be entitled. *Cf. United States v. Anderson*, 929 F.2d 96, 100 (2d Cir.1991) (confession coerced when police told suspect that he could either have an attorney present during questioning or cooperate with the government). This extrinsic consideration not only impaired free choice, but also cast doubt upon the reliability of the resulting confession, for one can easily imagine that a concerned parent, even if actually innocent, would confess and risk prison to avoid losing custody of her children and their welfare benefits. *Cf. Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) (confession coerced when police threatened to take suspect's wife into custody if he didn't confess); *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (confession coerced when officer, a close friend of defendant, told defendant that officer would get in trouble if defendant did not confess).

The type of factual misrepresentation employed to induce Holland's Des Plaines confession, then, is not inherently coercive. We recognize, of course, that certain ancillary practices—such as browbeating a suspect with a misrepresentation over an extended period of time—could transmute this tactic into a more coercive one, but Holland does not allege that the officer here used any such ancillary practice. Accordingly, the trickery in this case bears little upon our examination of whether, under the totality of the circumstances, Holland's second confession was involuntary.

■ Finally, we consider Holland's personal characteristics, including his age, education, intelligence and prior experience with the police, in determining whether he voluntarily tendered the Des Plaines confession. *Pharr*, 951 F.2d at 120; *United States v. Cahill*, 920 F.2d 421, 427 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2058, 114 L.Ed.2d 463 (1991); *Smith v. Duckworth*, 910 F.2d 1492, 1496 (7th Cir.1990); *United States v. Oglesby*, 764 F.2d 1273, 1278 (7th Cir.1985). Holland was approximately twenty-four years old during the events in question. He does not claim any lack of education or intelligence; in fact, the state trial judge found him to be well-composed, intelligent and articulate. In addition, Holland had substantial experience with the criminal justice system; he had four prior armed robbery convictions and was on parole at the time of the interrogation. *Holland*, 117 Ill.Dec. at 111, 520 N.E.2d at 272. As such, Holland "was not disadvantaged by youthful ignorance or the naivete born of inexperience." *Oglesby*, 764 F.2d at 1278.

In sum, we find that the circumstances surrounding Holland's Des Plaines confession were not sufficiently manipulative or coercive to have overborne his free will. The beating Holland received at the hands of the Schiller Park police, if it indeed occurred, is to be condemned. It did not foreclose, however, the possibility that Holland might subsequently tender a voluntary confession. The Des Plaines interrogation was brief (approximately 30 minutes), and sufficiently removed in time and place from the alleged Schiller Park beating. The deception employed by the Des Plaines officer was not the type that could have undermined Holland's free will. Holland was a mature adult with ample prior experience in the criminal justice system. While the circumstances surrounding the Des Plaines interrogation were by no means ideal, they did not render Holland's confession involuntary.

## II.

■ The district court also granted habeas relief on the ground that Holland, a white man, was entitled to an evidentiary hearing under *Batson v. Kentucky, supra,* to contest the state's alleged discriminatory use of its peremptory challenges to exclude blacks from the petit jury. In so holding, the court accurately presaged *Powers v.*

*Ohio,* —— U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), which held that a criminal defendant may launch a *Batson* attack on a prosecutor's racially motivated peremptory challenges regardless of whether the defendant and the excluded jurors share the same race. There was some dispute in *Powers* on that point; two Justices believed that *Batson* challenges should proceed only when there is racial identity between the defendant and the excluded jurors. *Id.* 111 S.Ct. at 1374–77 (Scalia, J., dissenting, joined by Rehnquist, C.J.).

The state concedes that the district court, in granting Holland the right to advance a cross-racial *Batson* claim, accurately presaged *Powers,* but contends that a pre-*Powers* federal habeas court was foreclosed from reaching the issue in the first instance. The dispute is as follows. The Supreme Court decided *Powers* after Holland's conviction became final. Under *Teague v. Lane, supra,* Holland may benefit from *Powers* on collateral review (although the district court ruled before *Powers,* we indulge the fiction that it implemented *Powers* as convenient shorthand) only if *Powers* was not a "new rule," but rather was *"dictated* by precedent at the time [his] conviction became final." *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070 (emphasis in original).[4] The state contends that *Powers* established a new rule, and Holland disagrees. The only cases (in existence at the time Holland's conviction became final) that could have possibly dictated *Powers* are *Batson* and *Holland v. Illinois, supra.* The following discussion explains why they did not.

### A.

With regard to *Batson,* the district court held that "[p]ermitting a white defendant to protect a black juror's equal protection rights is merely an application of the princi-

ple that governed … *Batson,* and is thus not a 'new rule.'" 754 F.Supp. at 1255. That we disagree is not to deny that *Powers* "applied" *Batson* in a way the term is ordinarily employed. *Batson* held that the equal protection clause prohibits the prosecution from using its peremptory challenges against potential jurors "solely on account of their race." *Batson,* 476 U.S. at 89, 106 S.Ct. at 1719. It further held that to establish a violation, "the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* at 96, 106 S.Ct. at 1723. *Powers,* then, merely "applied" *Batson* in a case where the excluded venirepersons were of a different race than the defendant. Same principle, with a twist.

But it is precisely this twist that renders *Powers* a new rule, at least with regard to *Batson.* *Teague* gave the term "applied" a different, more stringent meaning: a case applies an old rule only if its holding is "compelled" or "dictated" by existing precedent. *Sawyer v. Smith,* 497 U.S. 227, 110 S.Ct. 2822, 2828, 111 L.Ed.2d 193 (1990). In contrast, a case announces a new rule if its outcome was "susceptible to debate among reasonable minds," or if a contrary result would not have been "an illogical or even a grudging application" of prior precedent. *Butler v. McKellar,* 494 U.S. 407, 415, 110 S.Ct. 1212, 1218, 108 L.Ed.2d 347 (1990); *see also Stringer v. Black,* —— U.S. ——, 112 S.Ct. 1130, 1135, 117 L.Ed.2d 367 (1992); *Sawyer,* 110 S.Ct. at 2828–31. "[T]he fact that a court says that its decision was within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding

---

**4.** *Teague* and its progeny created two exceptions. Federal courts may apply a "new rule" on collateral review only if it (1) places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making power to proscribe," or prohibits "a certain category of punishment for a class of defendants because of their status or offense," *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 2952–53,

106 L.Ed.2d 256 (1989) (citations omitted), or (2) is a "'watershed rule[ ] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 1263, 108 L.Ed.2d 415 (1990). Holland does not contend that *Powers* falls within either of these exceptions.

whether [it] is a 'new rule' under *Teague.*" *Butler,* 494 U.S. at 414, 110 S.Ct. at 1217.

We recently had occasion in *Taylor v. Gilmore,* 954 F.2d 441 (7th Cir.1992), *petition for cert. filed* (U.S. Apr. 27, 1992) (No. 91–1738)—more than a year after the district court's decision in this case—to synthesize an approach to differentiating new rules from old under *Teague* and its progeny:

> First, we determine whether the case clearly falls in one category or another— if it overrules or significantly departs from precedent, or decides a ·question previously reserved, it is a new rule, while if it applies a prior decision almost directly on point to a closely analogous set of facts, it is not. Second, when the question is a close one, we will look to (1) whether the case at issue departs from previous rulings by lower courts or state courts, and (2) the level of generality of prior precedent in light of the factual context in which that precedent arose.

*Id.* at 448. Given this, one could make a good argument that *Powers* represents a significant departure from *Batson,* and hence is clearly a new rule (with regard to *Batson* ). *Batson* strongly indicated that its mandate would only reach situations where the defendant and the excluded jurors shared the same race, and *Powers* implicitly recognized that it was ·breaking new ground by extending the scope of *Batson* to cover cross-racial claims. *See Powers,* 111 S.Ct. at 1373 ("The emphasis in *Batson* on racial identity between the defendant and the excused prospective juror *is not inconsistent* with our holding today that race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges.") (emphasis supplied).

But we need not go that far, for even assuming the question is a close one, applying the two-pronged inquiry in *Taylor* demonstrates that *Powers* was not compelled by *Batson.* First, prior to *Powers,* a number of appellate courts held that *Batson* did not permit a defendant to challenge the state's discriminatory use of peremptory challenges against venirepersons of a different race. *See United States v. Angiulo,* 847 F.2d 956, 984 (1st Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988); *United States v. Townsley,* 856 F.2d 1189, 1190 (8th Cir.1988) (en banc), *cert. dismissed,* —— U.S. ——, 111 S.Ct. 1406, 113 L.Ed.2d 461 (1991); *United States v. Vaccaro,* 816 F.2d 443, 457 (9th Cir.), *cert. denied,* 484 U.S. 914, 108 S.Ct. 262, 98 L.Ed.2d 220 (1987); *United States v. Rodriquez–Cardenas,* 866 F.2d 390, 392 (11th Cir.1989), *cert. denied,* 493 U.S. 1069, 110 S.Ct. 1110, 107 L.Ed.2d 1017 (1990). That these courts were ultimately proved wrong by *Powers* is of marginal relevance under *Teague.* What matters is that these cases, which we find to be "reasonable, good-faith interpretations of" *Batson* rather than rogue elephants, strongly indicate that the outcome in *Powers* was "susceptible to debate among reasonable minds," and hence not compelled by *Batson. Butler,* 494 U.S. at 414, 415, 110 S.Ct. at 1217, 1218; *see also Taylor,* 954 F.2d at 446.

*Taylor* also requires that we examine "the level of generality of [*Batson* ] in light of the factual context in which [it] arose" to determine whether it dictated the result in *Powers. Taylor,* 954 F.2d at 448. Read in the manner most charitable to Holland, *Batson* established a rule that the state's racially discriminatory use of peremptory challenges violates the equal protection rights of the defendant and the excluded jurors, and applied that rule in a context where both the defendant and said jurors shared the same race. As such, it was too general to have compelled *Powers.* Owing to the particular factual situation underlying *Batson,* it was unclear whether the case applied *only* to defendants who were of the same race as the excluded jurors, or to *all* defendants regardless of race. To have "compelled" *Powers* within the meaning of *Teague,* the rule established in *Batson* would have had to be more specific (e.g., "defendants may challenge the state's racially discriminatory use of peremptory challenges whether or not they are of the same race as the excluded jurors"). Or the defendant in *Batson* would have had to have been of a different race than the excluded jurors. (Either possibili-

ty would have rendered *Powers* superfluous.) In sum, *Batson*, even when read in the light most favorable to Holland, had a latent ambiguity; it did not specifically permit cross-racial attacks on the state's peremptory challenges, and thus conceivably was limited to circumstances where the defendant and the excluded jurors shared the same race.

In point of fact, *Batson* was not as general as the preceding analysis presumes. As noted, *Batson* emphasized the racial identity between the excluded jurors and the defendant; it held that to establish a prima facie case of purposeful discrimination, a defendant must show, among other things, "that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723 (citation omitted). Its specificity therefore hurts rather than helps Holland, for in this light *Batson* not only failed to compel *Powers*, but nestled somewhat uncomfortably with it. *See Powers*, 111 S.Ct. at 1373; *id.* at 1375–77 (Scalia, J., dissenting); *cf. Taylor*, 954 F.2d at 447–48 (*Smith* and *Jones* hypothetical). Accordingly, *Batson* did not dictate the result in *Powers*.

### B.

A closer, and more novel, question is raised by Holland's contention that *Holland v. Illinois, supra,* compelled *Powers*. That it is Holland himself who makes this assertion might seem odd; if *Holland v. Illinois* (like *Powers* ) requires that Holland receive a *Batson* evidentiary hearing, why did he have to file a habeas petition to get one when *he* was the petitioner in the Supreme Court? The explanation is relatively straightforward. When Holland petitioned for certiorari after the Illinois Supreme Court affirmed his conviction, he sought review only of that Court's ruling that the sixth amendment does not permit a defendant to attack the state's discriminatory use of peremptory challenges against jurors of a different race. He expressly disavowed the argument that defendants can bring cross-racial *Batson* claims under the equal protection clause. *See Holland*, 493 U.S. at 490–91, 110 S.Ct. at 812–13 (Marshall, J., dissenting). This strategy, reasonable in light of *Batson*, turned out to be a huge tactical mistake. The U.S. Supreme Court granted certiorari on the sixth amendment issue and affirmed the Illinois Supreme Court. However, five Justices signalled that Holland might well have prevailed had he raised an equal protection argument under *Batson*. *Id.* 493 U.S. at 488–90, 110 S.Ct. at 811–12 (Kennedy, J., concurring); *id.* at 490–92, 110 S.Ct. at 812–14 (Marshall, J., dissenting, joined by Brennan and Blackmun, JJ.); *id.* at 506–08, 110 S.Ct. at 821 (Stevens, J., dissenting).

Due to his choice of a sixth amendment strategy in the Supreme Court, Holland now must seek relief via a circuitous route. He argues as follows: the concurring and dissenting opinions in *Holland*, representing the view of five Justices, established a rule permitting cross-racial *Batson* claims, but did not apply that rule for the aforementioned reasons. All is not lost, however; since this rule was established during direct review of Holland's conviction (at the last possible moment), he is entitled to its retroactive application on collateral review under *Teague*. Put another way, *Powers*, although decided after Holland's conviction became final, merely made explicit what was already settled in *Holland*, and hence was dictated by that decision. At issue, then, is whether Holland is correct in contending that *Holland* actually settled the cross-racial *Batson* issue. If it did, there can be no doubt that Holland must prevail; unlike the case with *Batson* and *Powers*, there are no differences, subtle or otherwise, between *Powers* and the rule Holland claims was established in *Holland*. If, in contrast, *Holland* did not settle anything under the equal protection clause, *Powers* is a new rule.

This is not an easy question to resolve. The majority opinion in *Holland*, representing the views of five Justices, left the cross-racial *Batson* issue open, declining to address its merits. *Holland*, 493 U.S. at 487 & n. 3, 110 S.Ct. at 811 & n. 3. Justice Kennedy joined the majority's disposition

of Holland's sixth amendment claim, but concurred separately to address the equal protection issue. While stating that a cross-racial *Batson* claim "would have merit," he acknowledged that "this case does not resolve" the issue. *Id.* 493 U.S. at 488, 110 S.Ct. at 811; *see also id.* at 489, 110 S.Ct. at 812 ("the availability of a Fourteenth Amendment claim by a defendant not of the same race as the excluded juror is foreclosed neither by today's decision, nor by *Batson*"). Justice Marshall, joined by Justices Brennan and Blackmun, dissented from Court's sixth amendment ruling, and expressed puzzlement at Holland's disavowal of an equal protection claim. *Id.* 493 U.S. at 490, 110 S.Ct. at 812. He signalled his support for such a claim, but, like Justice Kennedy, declined to join the issue on the merits, stating that it was resolved by neither *Batson* nor *Holland* and "is one on which the Court has not ruled." *Id.* at 492, 110 S.Ct. at 814. Justice Stevens also dissented from the Court's sixth amendment ruling, but went on to actually decide the cross-racial *Batson* issue on the merits in Holland's favor. *Id.* 493 U.S. at 506–08, 110 S.Ct. at 821–22. In sum, only Justice Stevens reached the merits and eight Justices reserved the issue; of those eight, four expressed no view, while the other four indicated that they might well have agreed with Justice Stevens had Holland properly presented the issue. The Court's probable course was fairly clear. *See id.* at 492, 110 S.Ct. at 814 (Marshall, J., dissenting) ("For the reader who seeks guidance on how the Court would rule if the [cross-racial *Batson*] issue were presented and argued, the agreement of five Justices that a defendant's race is irrelevant ... is ... illuminating."). Yet in deciding whether the Court actually established a binding constitutional rule, we must look not to its probable course, but to whether it actually reached its destination in *Holland.*

We side with the state here, but only on the most narrow of margins. First, we find it telling that neither Justice Kennedy nor Justice Marshall followed Justice Stevens' example in actually deciding the cross-racial *Batson* issue on the merits.

This suggests that the four abstentious but supportive Justices did not intend to settle a rule of law, but rather were content to reserve the issue. Perhaps they felt constrained by Supreme Court Rule 14.1(a), which limits the Court's consideration to questions set forth in the certiorari petition. But irrespective of their motivation, *Holland* only settled the sixth amendment issue. Equally telling is the Court's decision not to follow its own example in *Batson,* where, as in *Holland,* "the petitioner declined to challenge the discriminatory exercise of peremptory challenges on equal protection grounds, framing the issue at argument and in his briefs in Sixth Amendment terms." *Id.* at 506, 110 S.Ct. at 821 (Stevens, J., dissenting). Yet *Batson,* skirting Rule 14.1(a), rested its holding on the equal protection clause, a "constitutional provision neither presented, briefed, nor argued." *Id.* 493 U.S. at 487 n. 3, 110 S.Ct. at 811 n. 3. That Justices Marshall and Kennedy decided not to do the same in *Holland*—in an essentially identical context and with what amounted to an invitation by Justice Stevens—is significant. They had a clear blueprint yet chose not to follow it, further evincing their desire not to establish a rule of law in *Holland.*

The majority opinion in *Powers* provides additional support for our conclusion. At the outset, the Court reiterated its holding in *Holland,* and then adverted to the concurring and dissenting opinions addressing the cross-racial *Batson* issue: "We held [in *Holland* that] the Sixth Amendment did not restrict the exclusion of a racial group at the peremptory challenge stage. Five members of the Court there said a defendant *might* be able to make the objection on equal protection grounds." *Powers,* 111 S.Ct. at 1367 (emphasis added) (citations omitted). The Court's use of the word "might" rather than "would" is conspicuous; "would" would have suggested that the Court believed that *Holland* resolved the issue, while its use of "might" suggests that it believed the issue was left open in *Holland.* Moreover, the remainder of *Powers* is devoid of any reference to the possibility that five Justices in *Holland*

presaged the result reached therein; the only citations to *Holland* are from Justice Scalia's majority opinion, *Powers*, 111 S.Ct. at 1370 & 1373, which expressly declined to address the merits of the cross-racial *Batson* issue. Had the concurring and dissenting opinions in *Holland* settled anything, one would have expected *Powers* to say something like: "In *Holland*, five members of this Court determined that criminal defendants may object to the state's race-based peremptory challenges whether or not the defendant and the excluded jurors share the same race."

That *Powers* did not say anything like this weighs against Holland's contention that *Holland* "compelled" *Powers* within the meaning of *Teague*. It remains true that "[t]he simple fact that a decision, for whatever reason, fails to cite the authorities that compel it does not render it a new rule." *Taylor*, 954 F.2d at 452. *Powers*, though, actually cited the authority—the concurring and dissenting opinions in *Holland*—that Holland claims compels it, but, significantly, did not rest its holding on that authority. *See Powers*, 111 S.Ct. at 1367; *cf. Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 540–41, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985) (rejecting "bitter with the sweet" procedural due process rule advanced by plurality opinion in *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), while explicitly adopting alternative rule advanced by concurring and dissenting opinions in *Arnett*). Instead, *Powers* rested its substantive analysis primarily upon *Batson*, which, as determined above, does not compel *Powers*, and several third-party standing cases, which do not compel *Powers* either.

Based upon the foregoing, we find that *Powers* is a new rule with respect to *Holland*, and hence is a new rule, period. Holland is therefore not entitled to its retroactive application on collateral review.

\* \* \* \* \* \*

One note before concluding. At argument, the state raised, for the first time, *Arizona v. Fulminante, supra*, for the proposition that introducing coerced confessions at a criminal trial is not per se revers-ible error, but rather is subject to the harmless error rule of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). It did so to support reversal of the district court's judgment in the event we upheld the district court's determination that Holland's second confession was coerced. Since Illinois did not argue harmless error in either of its briefs, it submitted *Fulminante* in a Rule 28(j) filing shortly after argument.

■ The state's belated attempt to inject *Fulminante* at oral argument is both disturbing and unavailing. Regrettably, this is not the first time a situation like this has arisen in a habeas case from Illinois. In *Wilson v. O'Leary, supra*—which, coincidentally, was one of the strongest cases available to support a ruling that Holland's second confession was voluntary, but which the state neglected to cite—the state sought reversal of a habeas writ, and attempted to raise a harmless error argument in its reply brief. We rebuffed this attempt with the following caveat: "All arguments for reversal must appear in the opening brief, so that the appellee may address them. We have consistently refused to consider arguments withheld until the reply brief." *Wilson*, 895 F.2d at 384 (citations omitted). The same holds for grounds withheld until oral argument. *Lim v. Central DuPage Hosp.*, 871 F.2d 644, 648 (7th Cir.1989). Nothing in the either of the state's briefs even alluded to harmless error, and *Fulminante* thus raised a completely new ground for reversal.

Of course, the state may advance new grounds if they arise after briefing. But that is not what occurred here. The state filed its opening brief on July 19, 1991. *Fulminante* had been decided about four months earlier, on March 26, 1991. It did not deal with an easily overlooked or technical point of law; *Fulminante* was a watershed case that announced a significant departure from the long standing rule that admitting coerced confessions at trial is *per se* reversible error. *Fulminante*, 111 S.Ct. at 1253–54 (White, J., dissenting). Owing to its considerable effect upon the legal landscape, *Fulminante* played prominently not only among lawyers, but also in

the lay press, both national and local. *See, e.g.*, Linda P. Campbell, "Court Eases Rule on Confessions: Coerced Statements May Not Invalidate a Conviction," *Chi. Trib.*, Mar. 27, 1991, § 1, at 1; Linda Greenhouse, "High Court, 5 to 4, Softens Stand Against Confessions by Coercion," *N.Y. Times*, Mar. 26, 1991, at A1; Bob Cohn, "Coerced Confessions: No Harm Done," *Newsweek*, Apr. 8, 1991, at 52; Richard Lacayo, "Confessions That Were Taboo Are Now Just a Technicality," *Time*, Apr. 8, 1991, at 26. That *Fulminante* escaped the attention of the state's appellate attorneys is disquieting, particularly in light of the fact that the state argued harmless error in the district court, *before Fulminante* made such arguments available.

Holland's attorney properly filed a motion to strike the state's Rule 28(j) filing. In response, the Illinois Attorney General's office, to its credit, expressed regret to this Court and to Holland for the error, which it ascribed to an Assistant Attorney General who had left the office after penning the opening brief. The state appropriately dubbed its failure to cite *Fulminante* "inexplicable." We trust that we will not encounter such an unfortunate occurrence in the future.

REVERSED.