2) Caption, civil cases



COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS



JESUS BRIONES,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee.
§


 


§


 


§


 


§


 


§


 


 § 


No. 08-01-00492-CR



Appeal from the


384th District Court


of El Paso County, Texas 


(TC# 20010D03245)



MEMORANDUM OPINION


 Jesus Briones appeals his conviction for aggravated sexual assault with a child in
which the jury assessed punishment at ten years' confinement. Briones complains that the
trial court committed error when it failed to exclude his written custodial statement
confessing contact with his child. We find that the court did not abuse its discretion in
allowing the statements into evidence. We affirm.

Facts

 Both Briones's points of error relate to the admission of a confession that was
subject to a pretrial motion to suppress. That motion was denied by the trial court.

 On the morning of June 9, 2001, Jesus Briones was playing on the floor with his
son in the house of his ex-wife Susanna Nunez, while she drew a bath for the three-year-old boy. She had already prepared the boy for the bath, taking off all his clothes, and
Briones was making the boy laugh by tickling him and giving him "besitos," little kisses. 
When Ms. Nunez returned to the living room, she saw Briones kiss the boy on his penis. 
She did not think the kiss was sexual in nature, and believed that it could have been
accidental as the child squirmed from the tickling. The only evidence of Briones actually
putting the child's penis in his mouth comes from his statement to police officers.

 That afternoon Ms. Nunez drove to Juarez and then stayed at a friend's house that
night after returning. On June 11, she spoke to a counselor at her college. The counselor
told her to call the El Paso County Sheriff's Department and report the incident.

 Responding to the call was Detective Jaime Terrazas, who works for the Crimes
Against Children unit of the Criminal Investigations Division. After interviewing Ms.
Nunez and the child, Detective Terrazas obtained a prosecution affidavit and an arrest
warrant. With warrant in hand, Detective Terrazas and his partner Detective Alfredo
Medina went to the house in which Briones lives with his father.

 The detectives took Briones to the Sheriff's Department substation and read him
his Miranda rights in Spanish, which he signed and dated. Briones indicated to detectives
that he understood these rights. During questioning, the detectives told Briones about the
allegations against him, and Briones gave a statement in Spanish. Detective Terrazas
typed the report as he asked questions. After the detectives finished the questioning, they
read the report to Briones and then had him read it himself. Briones indicated that he
knew how to read and write in Spanish to the detectives at the interview. The detectives
never tested his ability to read.

 When Briones read the report silently to himself, the detectives explained that he
could make any additions, alterations, changes, or deletions that he wished to make. He
appears to have made none, and signed the report. The question arises as to the
voluntariness of the statement in light of Briones's understanding of the events. Briones
has an IQ of between 63 and 67. Despite the improper grammar and spelling of Detective
Terrazas in the statement, leading to numerous comments and difficulties from the
translator during the in-court translation, Briones made no changes or comments
concerning the confession. Some of the words used in the statement were not even
recognizable to the translator.

 Briones was told at the interview that he could not see his son until after the
investigation. The detective maintains that he did not coerce, threaten, or make promises
in exchange for Briones's statement. Detective Terrazas testified that he would not
interrogate a person if he knew that a person was mentally disabled. In this instance, no
one advised him of Briones's situation, and he did not notice anything that made him feel
that he should stop the interview. Both Detective Terrazas and Detective Medina testified
that they have never been in a situation where they stopped an interview with a suspect
based upon their perception that the suspect had a limited mental capacity.

 Peter Fernandez, Ph.D., reported that on the Wechsler Adult Intelligence Scale-Third Edition and the Test of Nonverbal Intelligence-Third Edition, Briones measured
quotients of 67 and 63, respectively. Dr. Fernandez also assessed his verbal and
analytical skills:

 Most noticeable of Jesus were his quiet demeanor and his constricted affect. 
Of the latter he indicated feeling nervous due to having been 'threatened.'


. . .


 Jesus's speech in Spanish was fluent, but subtly dysarthric. He mentioned
having been delayed in learning to speak, but not having received speech
therapy. Although he spoke in short sentences, his stream of thinking was
direct.


. . .


 Jesus attended school in Juarez, Mexico, to the second grade, and then in El
Paso from the first to the tenth grade. He repeated the second grade in El
Paso. He reportedly was a 'slow learner'. Jesus worked two years in a
cafeteria and then assisted his father in the latter's work. He received
supplementary social security income.


 Jesus correctly counted backwards from twenty, spelled a word backwards,
recalled four of four hidden objects, and solved hypothetical problems. 
Conversely he demonstrated difficulty in reciting the alphabet, he recalled
only three of four verbal items after a brief interval, and he tended to be
concrete in identifying similarities among concepts.


The report concluded that Briones "demonstrates mild deficiency on intellectual
measures."


 Another report from Mariam A. Marvasti, M.D., confirmed the findings of Dr.
Fernandez. Her evaluation revealed that Briones's high school education was in special
education classes, and that Briones's reading and writing level was at the sixth grade
level. Although "[h]is intellectual functioning was estimated as below average given his
vocabulary and the results of his psychological testing. . . .[h]is insight and judgment
seemed to be fair at the time of these examinations."

The confession was properly admitted as voluntary

 Briones's first point of error urges that the trial court erred in denying his motion
to suppress a confession which was given involuntarily. His argument is made in the
context of his mental capacity and his lack of understanding as to what he was doing. He
contends that tactics used by law enforcement officers on those with normal intelligence
may constitute coercion when used on an individual like himself who is mentally
deficient.

i. standard of review

 The determination of whether a defendant was in custody at the time he gave
statements is a mixed question of law and fact. Since that decision does not depend upon
the credibility or demeanor of witnesses before the trial court, we review the custody
question de novo. In re D.A.R., 73 S.W.3d 505, 509-10 (Tex. App.--El Paso 2002, no
pet.); Jeffley v. State, 38 S.W.3d 847, 853 (Tex. App.--Houston [14th Dist.] 2001, pet.
ref'd). If a defendant is in custody, the court then proceeds to determine whether the
statement was involuntarily obtained through force or coercion. The standard of review
regarding the voluntariness of a confession is a deferential review of the trial court's
determination of the historical facts and a de novo review of the law's application to those
facts. Henderson v. State, 962 S.W.2d 544, 564 (Tex. Crim. App. 1997). As the question
of voluntariness in most cases, as in this one, will rely upon the factual determinations
made by the trial judge after hearing and judging the credibility of the testifying
witnesses, the standard of review applied will be one of abuse of discretion. Franks v.
State, 90 S.W.3d 771, 784 (Tex. App.--Fort Worth 2002, pet. ref'd, untimely filed). The
test for an abuse of discretion is not whether, in our view, the facts present an appropriate
case for the trial court's action. Instead, the court of appeals determines whether the court
acted without reference to any guiding rules and principles. Coots v. Leonard, 959
S.W.2d 299, 301 (Tex. App.--El Paso 1997, no pet.) (citing Craddock v. Sunshine Bus
Lines, Inc., 134 Tex. 388, 133 S.W.2d 124, 126 (1939)).

ii. custody

 The voluntariness of a statement is only an issue if it was the result of a custodial
investigation. Rodriguez v. State, 939 S.W.2d 211, 215 (Tex. App.--Austin 1997, no
pet.). Briones was clearly in custody when his statement was taken. An arrest warrant
had already issued, he was not free to go, and the trial court so found.


iii. an overview of the analysis for whether a statement is voluntary

 The question in this case is whether Briones's statement was given voluntarily. 
Article 38.21 of the Code of Criminal Procedure provides that in order for a statement to
be used against a defendant it must be freely given:

 A statement of an accused may be used in evidence against him if it appears
that the same was freely and voluntarily made without compulsion or
persuasion, under the rules hereafter prescribed.


Tex. Code Crim. Proc. Ann. art. 38.21 (Vernon 1979).

 A statement is involuntary if the record reflects "official, coercive conduct of such
a nature that any statement obtained thereby was unlikely to have been the product of an
essentially free and unconstrained choice by its maker." Alvarado v. State, 912 S.W.2d
199, 211 (Tex. Crim. App. 1995). Voluntariness of a confession is decided by
considering the totality of circumstances under which the statement was obtained. 
Creager v. State, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997); Penry v. State, 903
S.W.2d 715, 744 (Tex. Crim. App. 1995). Mental deficiency is a factor in this
calculation. Penry, 903 S.W.2d at 744; Cornealius v. State, 870 S.W.2d 169, 175 (Tex.
App.--Houston [14th Dist.] 1994), affirmed by 900 S.W.2d 731 (Tex. Crim. App. 1995). 
However defendant's mental condition, by itself and apart from its relation to official
coercion, does not require a conclusion of involuntariness. Penry, 903 S.W.2d at 744;
Walker v. State, 842 S.W.2d 301, 303 (Tex. App.--Tyler 1992, no pet.) (citing Colorado
v. Connelly, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986)). The
question to be resolved is whether the accused's mental impairment is so severe that he
was incapable of understanding the meaning and effect of his statement. Casias v. State,
452 S.W.2d 483, 488 (Tex. Crim. App. 1970); Reed v. State, 59 S.W.3d 278, 281-82
(Tex. App.--Fort Worth 2001, pet. ref'd); Harner v. State, 997 S.W.2d 695, 699 (Tex.
App.--Texarkana 1999, no pet.).

iv. valid waiver of right to remain silent

 An inquiry into the waiver of Miranda rights has two dimensions. Franks, 90
S.W.3d at 785. First, the waiver must be voluntary as a product of free and deliberate
choice rather than intimidation, coercion, or deception. Id. (citing Colorado v. Spring,
479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987); Ripkowski v. State, 61
S.W.3d 378, 384 (Tex. Crim. App. 2001)). Second, the waiver must be made with full
awareness both of the nature of the right being abandoned and the consequences of the
decision to abandon it. Id. (citing Spring, 479 U.S. at 573, 107 S.Ct. at 857; Ripkowski,
61 S.W.3d at 384).

 Here, Detective Terrazas testified that he did not coerce, threaten, or make
promises in exchange for Briones's statement. He also testified that he did not know that 
Briones was mentally retarded during the interview. Important to our resolution of this
case is that, though Briones had an IQ of between 63 and 67 and clearly has limited
reasoning ability, there was no evidence that he either did not understand or was not
capable of understanding the rights that he waived before giving his statement. To the
contrary, the report of Dr. Marvasti concludes that Briones, though below average in
intelligence, could exercise proper judgment. We therefore cannot conclude that the trial
judge abused his discretion in finding Briones's statement admissible.

v. no improper coercion during interrogation

 Briones argues that he was coerced by Detective Terrazas's statement during his
interview that Briones could not see his son until after the investigation was concluded. 
During the interview, Detective Terrazas explained to Briones that his ex-wife was going
to be filing for an emergency protective order for herself and the child. The detective
testified that "when it's family-related family violence, we have to advise him." The
detective recounted what he said at the suppression hearing:

 Told him that he couldn't see him until after the investigation. I mean, he
was being charged with performing oral sex on his son. He was advised not
to go near him-as simple as that. A protective order was going to be sought
keeping him from doing so, and that is permissible. I'm obligated to advise
him not to go near the victim or the victim's mother. I mean, I'm not a
Judge; I can't tell him, [y]ou can never see your child. I just advised him
that it was to his advantage not to see the child.


Briones argues that the threat of not being able to see his child until after the investigation
could coerce a person of normal intelligence into giving a confession, and this threat is
even more effective on a person with an IQ of 67. The effects of such statements in a
particular case must be presented to the initial fact finder on the record and must meet the
standard for being unduly coercive to warrant exclusion of a confession.

 In support of this argument, Briones relies upon Lynumn v. Illinois, 372 U.S. 528,
83 S.Ct. 917, 9 L.Ed.2d 922 (1963), in which the police told a suspect in a marijuana case
that she was in jeopardy of losing her welfare benefits and custody of her children, but
offered to recommend leniency if she would confess. Holland v. McGinnis, 963 F.2d
1044, 1051 (7th Cir. 1992) (discussing Lynumn).

 [T]his particular deceptive practice did more than affect the suspect's
beliefs regarding her actual guilt or innocence, and judgments regarding the
evidence connecting her to the crime. It also distorted the suspect's rational
choice . . . by introducing a completely extrinsic consideration: an empty
but plausible threat to take away something to which she and her children
would otherwise be entitled. . . . This extrinsic consideration not only
impaired free choice, but also cast doubt upon the reliability of the resulting
confession, for one can easily imagine that a concerned parent, even if
actually innocent, would confess and risk prison to avoid losing custody of
her children and their welfare benefits.


Id. at 1051-52.

 Detective Terrazas testified he did not coerce, threaten, or make promises in
exchange for Briones's statement. The officers simply stated that Briones would have to
stay away from the child until after the investigation and that the mother of the child was
seeking a protective order to keep him away. In Lynumn, confession to a drug charge
presented the danger that it was motivated solely by desire to maintain custody of
children. In contrast, here there was no like encouragement for Briones to confess to
sexual contact with his child; to the contrary, any such statement would ensure that he
would be kept from his child. This does not rise to the level of coercion, and we again
perceive no abuse of discretion. The first point of error is overruled.


A signature does not require a non-law enforcement witness

 Briones's second point of error is that the trial court erred in denying his motion to
suppress, because his statement resulted from a violation of article 38.22 of the Texas
Code of Criminal Procedure because it was without benefit of a non-law enforcement
Spanish interpreter. Specifically, Briones argues that there must have been a non-law
enforcement interpreter in the room to witness his signature on the confession. This is a
misreading of article 38.22, section 1, which states as follows:

 Section 1. In this article, a written statement of an accused means a
statement signed by the accused or a statement made by the accused in his
own handwriting or, if the accused is unable to write, a statement bearing
his mark, when the mark has been witnessed by a person other than a peace
officer.


Tex. Code Crim. Proc. Ann. art. 38.22, § 1 (Vernon 1979). Courts interpret statutes
according to the plain meaning of their text unless the language is ambiguous or the plain
meaning would lead to absurd results. Dickens v. State, 981 S.W.2d 186, 187 (Tex. Crim.
App. 1998) (citing Boykin v. State, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)). A
plain reading of this statute unambiguously puts the need for a witness to be someone
other than a peace officer only in the clause regarding the "mark" of a person that is
unable to write. The witness requirement is separated from the clause regarding
signatures by a disjunctive "or." Thus, this Court finds no merit in the argument
regarding a need for a non-law enforcement witness when the confession is that of a
person who can indicate assent to the veracity of a statement by signature. See Pete v.
State, 501 S.W.2d 683, 686 (Tex. Crim. App. 1973). Briones could read at a sixth grade
level and did sign his name to both the Miranda warnings and his statement.

 Incorporated within Briones's argument are contentions that the method by which
the statement was taken was questionable due to the fact that there was no non-law
enforcement translator, but that is not a requirement of the law. It is clear from the
comments of the in-court translator that the written Spanish used in drafting the statement
was quite bad. However, there is no evidence that what was written down, albeit in
questionable grammar and with improper spelling, was not what was told to the detectives
as they took the statement. The statement was read to Briones and he was then given a
chance to read it himself. Even if he were totally illiterate, the requirement of review of
the statement can be met by the detective's reading the statement to him. See Pete, 501
S.W.2d at 686. At any point before signing the statement, he could have made changes if
what he read, or what he heard from the detective, did not comport with what happened. 
The detectives informed him of this right. The second point of error is overruled.

Conclusion

 For the foregoing reasons, the conviction is affirmed.


 SUSAN LARSEN, Justice

February 27, 2003


Before Panel No. 4

Barajas, C.J., Larsen, and McClure, JJ.


(Do Not Publish)