**Opinion issued August 30, 2012.**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-11-00367-CR**

———————————

**BRANDON ANTWOINE WILLIAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 300th Judicial District Court**
**Brazoria County, Texas**
**Trial Court Case No. 62,072**

**MEMORANDUM OPINION**

A jury found appellant, Brandon Antwoine Williams, guilty of the offense

of murder,[1] and the trial court assessed his punishment at confinement for life with

---

[1]      *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2011).

a $10,000 fine. In three issues, appellant contends that the trial court erred in denying his motion to suppress evidence and admitting irrelevant and extraneous-offense evidence.

We affirm.

## Background

Lake Jackson Police Department ("LJPD") Officer R. Welch testified that on the morning of April 18, 2010, he was dispatched to the Fisherman's Wharf apartment complex where "possible shots" had been fired. Upon his arrival, Welch found several bullet casings and, after further investigation, discovered eight bullet holes in the door to one of the apartments. After entering the apartment, Welch saw the body of the complainant, Richard Morgan, on the floor. Welch noted that the complainant had suffered several gunshot wounds.

LJPD Detective K. Stanford, who was dispatched to investigate the death of the complainant, testified that upon his arrival at the apartment, he noted that the complainant's body was approximately three feet from the door. And his gunshot wounds "match[ed] up" with the "bullet holes through the door." Stanford opined that the complainant was "possibly standing . . . to look through the peephole" when he was shot. After examining eight bullet casings found outside the apartment, Stanford determined that the assailant had used "[s]ome kind of high-powered rifle."

2

Stanford contacted the complainant's sister, Tiffany Morgan, who directed him to speak with the complainant's girlfriend, Emily Terrell. Terrell directed Stanford to appellant's cousin, Quentin Williams, and appellant's friend Jake Sohrt, Quentin's roommate. Sohrt recommended that Stanford speak with appellant. Appellant told Stanford that his friends, Corey Sanders and Rickel Baker, were in possession of the firearms used in the complainant's murder. Stanford used appellant's cellular telephone to contact Baker in an effort to obtain the firearms. Baker and Sanders eventually led Stanford to a "shed in the backyard of [a] vacant house," in which Stanford found a "pistol-grip shotgun" and an "AK-47" or "military-type rifle." Stanford determined that the AK-47 was registered to appellant and it contained bullets "similar to the projectiles . . . recovered from [the complainant's] home."

Stanford obtained a warrant to search appellant's car, in which he seized a notebook containing "rap lyrics" and a target for shooting practice. The State then offered into evidence State's Exhibit number 40, a bag containing both the notebook and the target. Appellant objected to its admission "based on improper chain of custody and also the relevance." The State argued that the chain of custody was proper and, "[a]s to the relevancy, . . . it's target practicing and . . . rap lyrics that involve killing people." The trial court, finding the contents of

3

State's Exhibit number 40 to be more probative than prejudicial and the chain of custody satisfied, overruled appellant's objection and admitted the evidence.

Clute Police Department ("CPD") Officer R. Carlton testified that he interviewed appellant as part of the homicide investigation. Carlton initially read to appellant his legal rights, and appellant terminated the interview. Later, however, appellant "reinitiated contact" with Carlton because he wanted to tell "his side of the story." Appellant stated that Quentin had been planning on "shooting" the complainant through his "front door" because he was "supposedly seeing his ex-girlfriend," Terrell. Quentin used appellant's firearm to shoot the complainant, and appellant later disposed of the firearm.

Some time after Carlton had interviewed appellant, CPD Officer S. Harris interviewed appellant a second time. Before trial, appellant filed a motion to suppress any statements that he made during the second interview with Harris, alleging that his statements were coerced in violation of the United States Constitution,[2] the Texas Constitution,[3] and the Texas Code of Criminal Procedure.[4]

---

[2]    *See* U.S. CONST. amend. XIV.

[3]    *See* TEX. CONST. art. I, § 9.

[4]    *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 2005).

At a pre-trial hearing on appellant's motion to suppress the statements, Officer Harris testified that, after he had read to appellant his legal rights, appellant wanted to "tell his side of the story." At first, appellant "repeatedly" claimed that Quentin shot the complainant and appellant was not with him during the shooting. Harris eventually told appellant,

> You're already charged. There's no difference except for to show some remorse and maybe they won't seek the death penalty. Show no remorse, continue—continue to lie, why would the DA—the DA not want to? Tell me why they wouldn't want to seek the maximum punishment for someone who shows no remorse and does not want to tell the truth when they are caught.

Harris admitted that he did not "have any facts" regarding the case, had not spoken with anyone from the District Attorney's office, and did not know how the District Attorney's office planned to proceed against appellant. Harris mentioned the death penalty to appellant because he did not think that appellant "completely understood the severity of the crime that he was charged with." Harris did not make any other statements about the death penalty. At another point in the interview, Harris told appellant that gunshot residue testing had been performed on Quentin and the results from the test were negative. Harris admitted, however, that he had not yet received the test results.

Approximately thirty to forty-five minutes after Harris had mentioned the death penalty, appellant admitted that he, not Quentin, had shot the complainant. Harris opined that appellant's admission was not a reaction to Harris's statements

5

regarding the death penalty or the gunshot residue test.  Rather, Harris noted that appellant did not change his story until after Harris had asked whether, if appellant's "mother was put in the same position[,] . . . wouldn't [appellant] want his mother to know exactly what happened and who killed her son."  Harris concluded that appellant's admission "had nothing to do with the mention of the death penalty or the mention of the gunshot residue testing."

The trial court denied appellant's motion to suppress his statements, specifically finding that:

> In considering the totality of the circumstances of the interviews that were reviewed and offered — State's Exhibit 1, 2, and 3 — I will find that there is no causal connection between the tactics that were utilized by law enforcement in conducting the interview and the actual statement that was given.
>
> But considering the defendant's demeanor, the actions that you can see on the video, and the personal characteristics of [appellant] in watching the video, that he clearly understood what was going on during this subsequent interview with Detective Harris, and that there was no intimidation as a result of the tactics that were used.
>
> The only information that was forthcoming after the comment was used with regard to, what am I going to tell the mother of the alleged victim in this case?  And that it was not a result of intimidation, coercion, or deception by any of the officers that were involved.  And the motion is denied.

The trial court also made written findings on appellant's motion, stating that there was no coercion "as a result of the interrogation tactics used to obtain the statement" given to Harris.  The trial court then admitted into evidence appellant's

6

recorded oral admission to Harris and his written statement. In the recording, appellant admitted that he knocked on the complainant's door and fired his AK-47 when he heard the complainant reach the front door. He also knew that the bullets fired from an AK-47 could penetrate a bullet-proof vest.

Sohrt testified that on April 17, 2010, he returned to his apartment and found Quentin and appellant watching a movie. After Sohrt went to his bedroom, Quentin entered the bedroom to show Sohrt a firearm. Quentin then showed Sohrt a map of the Fisherman's Wharf apartment complex and stated that he was going to drop appellant off at the complex, where appellant was to shoot the complainant. Quentin and appellant left for the complainant's apartment about two hours later. On cross-examination, Sohrt testified that Quentin had been "upset" when Terrell began dating the complainant and had directed "angry" and "threatening" comments towards the complainant. The day after the shooting, Quentin told Sohrt that they had "followed through with his plan," and he asked Sohrt to "lie to the police, if need be."

Sanders testified that appellant, who was his friend and co-worker, had visited Sanders's house and asked him to "hold some weapons for him," including the AK-47 identified as the firearm used against the complainant, because appellant "had murdered somebody." Sanders refused the request, and appellant then called Baker to hide the weapons. When Detective Stanford called Sanders

7

and inquired about the location of the firearms, Sanders contacted Baker. The two then led Stanford to the vacant house where the firearms were located. Sanders also testified that in the course of working with appellant he had heard appellant "offer to handle someone else's problems" on "many occasions." As an example, he recalled an incident in which appellant, when visiting Sanders's house, approached two of his neighbors, produced a firearm, and told them, "Hey, if you got any problems, I'll take care of it for you."

**Voluntariness of Statements**

In his first issue, appellant argues that the trial court erred in denying his motion to suppress the statements given to Officer Harris because they were "the product of threats and coercion" and not "freely and voluntarily made without compulsion or persuasion."

We review a ruling on a motion to suppress evidence for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We generally consider only the evidence adduced at the suppression hearing unless the parties consensually re-litigate the issue at trial, in which case we also consider relevant trial testimony. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and review de novo the trial court's application of the law to facts not based on an

8

evaluation of credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, a trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, a trial court may choose to believe or to disbelieve all or any part of a witnesses' testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When the trial court makes findings of fact with its ruling on a motion to suppress, an appellate court does not engage in its own factual review but determines only whether the record supports the trial court's factual findings. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). Unless a trial court abuses its discretion in making a finding not supported by the record, we will defer to the trial court's fact findings and not disturb the findings on appeal. *Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991).

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion." TEX. CODE. CRIM. PROC. ANN. art. 38.21 (Vernon 2005). When considering whether a statement was voluntarily made, we consider the totality of the circumstances in which the statement was obtained. *Creager v. State*, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997).

A defendant's statement is involuntary if circumstances show that the defendant's will was overborne by police coercion. *Id.* at 856. The defendant's

9

will may be overborne if the record shows that there was "official, coercive conduct of such a nature" that a statement from the defendant was "unlikely to have been the product of an essentially free and unconstrained choice by its maker." *See Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995).

Appellant first asserts that Harris "falsely implied that the DA's office would be considering the death penalty." Appellant concedes that Harris's statement regarding the death penalty was not a "promise" but argues that it was "tantamount to a death threat" and "constituted coercion."

A misrepresentation made by a police officer to a suspect during an interrogation is a relevant factor to consider in assessing whether the suspect's statement was made voluntarily, but, standing alone, it is insufficient to render an otherwise voluntary statement inadmissible. *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 1424–25 (1969). The misrepresentation must be viewed in the context of the totality of the circumstances. *Id.* Some types of police deception employed during custodial interrogation that are designed to elicit a statement from an accused are constitutionally permissible. *See id.* The focus is on whether the behavior of the State's law enforcement officials was such as to overbear the will of the accused and bring about a statement not freely determined. *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741 (1961).

Appellant characterizes Officer Harris's statement regarding the death penalty as "trickery" or "deception" because it "falsely" implied that the death penalty was applicable to appellant's circumstances. However, Harris testified that the facts of the case had not yet been fully developed and he did not know whether appellant could be charged with capital murder. And Harris explained that he mentioned the death penalty to appellant not to deceive him, but to have him recognize the "severity" of the offense. Under these circumstances, the trial court could have interpreted Harris's statement not as a misrepresentation but as recognition of the death penalty as a possible punishment for certain homicides and that appellant could receive leniency if he cooperated. *See Espinosa v. State*, 899 S.W.2d 359, 362–64 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd) (concluding that police officer's statement that "[e]verything will be better" for defendant if he confessed was only suggestion of leniency and did not render statement involuntary); *see also Buzan v. State*, No. 14-02-00452-CR, 2002 WL 31890099, at *1 (Tex. App.—Houston [14th Dist.] Dec. 31, 2002, no pet.) (not designated for publication) (holding that trial court could have concluded police officer did not make misrepresentation regarding defendant's eligibility for probation where police officer's statement could be construed as "the punishment applicable to the offense generally and not to the particular circumstances" of defendant).

11

Appellant also asserts that Officer Harris "added to [his] discomfiture by lying to him about negative results of gunshot residue tests run on the co-defendant's hands in order to give the impression that police had more evidence than they really had." The State concedes that Harris made a misrepresentation concerning the gunshot residue tests, but argues that it did not render the appellant's statement involuntary.

Of the numerous types of police deception, misrepresentation relating to an accused's connection to a crime can be the least likely to render a statement involuntary. *Green v. State*, 934 S.W.2d 92, 100 (Tex. Crim. App. 1996). It has been noted that "[i]nflating evidence of [a defendant's] guilt interfere[s] little, if at all, with his 'free and deliberate' choice of whether to confess" because it does not "lead him to consider anything beyond his own beliefs regarding his actual guilt or innocence, his moral sense of right and wrong, and his judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime." *Id.* (quoting *Holland v. McGinnis*, 963 F.2d 1044, 1052 (7th Cir. 1992)); *Weaver v. State*, 265 S.W.3d 523, 534 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). Here, Officer Harris's misrepresentation concerning the gunshot residue tests related to appellant's connection to the crime. Harris testified that appellant did not appear to react to the statement. And the record shows that appellant did not admit to the shooting until later in the interview, when Harris asked whether

12

appellant would want his mother to know "exactly what happened to him" if he were ever murdered. We cannot conclude that the trial court abused its discretion in finding that appellant was not coerced into making his statements to Harris. Accordingly, we hold that the trial court did not err in denying appellant's motion to suppress his statements made to Officer Harris.

We overrule appellant's first issue.

### Admission of Evidence

In his second issue, appellant argues that the trial court abused its discretion in admitting evidence of his "bad character trait of offering to handle the problems of other people by using a firearm" and "a specific extraneous bad act to demonstrate this character trait." In his third issue, appellant argues that the trial court abused its discretion in admitting into evidence the notebook containing "gangsta rap lyrics" allegedly written by appellant because it "had no relevance apart from character conformity" and "any probative value it did have was clearly outweighed by the danger of unfair prejudice."

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006). Therefore, we will not reverse a trial court's ruling as long as it is within the "zone of reasonable disagreement." *Id.*

*Extraneous Offense*

At trial, Sanders testified that on "many occasions" he had seen appellant produce a firearm and "offer to handle someone else's problems." He also testified about a specific incident in which he saw appellant approach two of his neighbors, produce a firearm, and say, "Hey, if you got any problems, I'll take care of it for you." Appellant objected to the testimony as "not relevant" and as evidence of "extraneous bad acts that have nothing to do with this case." The trial court overruled the objection, held the evidence admissible "because of the nature of the defense," and explained,

> I'll provide an instruction in the jury charge for the extraneous and find that it is—that particular issue with regard to getting into other people's beef—is more probative than prejudicial as it goes to the plan and the scheme that's involved with regard to this particular matter.

Evidence of extraneous offenses is not admissible to prove the character of a person in order to show that he acted in conformity therewith. TEX. R. EVID. 404(b); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). However, such evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b). Evidence of an extraneous offense is also admissible to rebut a defensive theory. *Ransom v. State*, 920 S.W.2d 288, 301

14

(Tex. Crim. App. 1994); *Isenhower v. State*, 261 S.W.3d 168, 180 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

Appellant argues that the State, not appellant, first made the argument that appellant did not shoot the complainant or lacked a motive to shoot the complainant because the State introduced into evidence appellant's first interview with Officer Carlton, in which appellant stated that Quentin committed the shooting. However, appellant, in his opening statement, repeatedly raised the theory that Quentin had shot the complainant and only Quentin had a motive to shoot the complainant. For example, appellant's trial counsel stated,

> You're going to hear a lot of things about how [appellant] had absolutely no motive whatsoever to be involved in this. You're going to hear that this was—there was this long ongoing affair between [the complainant] and [appellant's] cousin, Quentin Williams. You're going to hear that Quentin Williams had a real vendetta against him. This has gone on for a very long time. All of the motive in this case was on Quentin Williams.
>
> . . . .
>
> You're going to hear about—talking about [appellant] going back to work. You're also going to hear that [Williams] fled to Temple shortly thereafter.
>
> . . . .
>
> There is absolutely zero, zilch, nada evidence—scientific evidence—to show that [appellant] was actually the person who was involved in this. Nothing.

15

Before appellant's statements to Officer Carlton were admitted into evidence, appellant also cross-examined the complainant's sister, eliciting testimony that Quentin had "an obsession" with Terrell, followed her to the complainant's apartment, and threatened the complainant. Thus, evidence that appellant, while producing a firearm, had offered to "take care" of other people's problems was relevant to rebut appellant's contention that only Williams had a motive to shoot the complainant. *See, e.g., Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (holding that State was permitted to use extraneous offense to rebut defensive theory presented in opening statement that complainant had fabricated her testimony).

Appellant further argues that, even if Sanders's testimony was relevant "apart from character conformity, the Rule 403 factors weigh against admission" because his testimony was more prejudicial than probative.

The trial court has the discretion to exclude extraneous offense evidence if it finds that the evidence's probative value is substantially outweighed by the danger of unfair prejudice. *See Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990). In conducting this balancing test, the trial court should analyze several factors, including, but not limited to, the probativeness of the proffered evidence, as well as the proponent's need for the extraneous evidence to establish a fact of consequence. *See id.* at 389–90. On appeal, appellant now argues that

16

the evidence was not probative because he was "clearly guilty" and "the State had an abundance of evidence" to prove appellant had shot the complainant, such as appellant's statements and the testimony of Sohrt regarding Quentin's plan for appellant to shoot the complainant. However, at trial, appellant disputed this evidence, arguing, as he does in this appeal, that his statements were not reliable due to alleged threats and coercion used by the police officers and noting that Sohrt spoke only with Quentin about the plan to shoot the complainant. And, as stated above, the evidence was probative to rebut appellant's defense that only Quentin, and not appellant, had a motive to harm the complainant.

Accordingly, we hold that the trial court did not abuse its discretion in admitting Sanders's testimony that appellant, while producing a firearm, offered to "take care" of other people's problems.

### Admission of Notebook

In regard to the notebook, the State offered, through the testimony of Detective Stanford, State's exhibit number 40, a bag containing both a "target" and the notebook, in which numerous violent "rap lyrics" were written. After eliciting, on voir dire, that Stanford was not "the first person to touch this piece of evidence" and Stanford was unsure which police officer had made indentifying marks on the bag, appellant then objected to the exhibit "based on improper chain of custody and also the relevance." The State argued that it had established proper

chain of custody and, "[a]s to the relevancy," "it's targeting practicing on this one" and "there are rap lyrics that involve killing people." When the State mentioned the lyrics, appellant objected, arguing, "We're getting into stuff that's not even in evidence." The trial court overruled appellant's objections.

In order to preserve a complaint for appellate review, the record must show that the complaining party gave the trial court an opportunity to rule on the complaint by presenting that complaint to the trial court in a specific and timely objection. *See* TEX. R. APP. P. 33.1(a); *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). Further, making the trial court aware of the complaint requires that both the grounds and what is being objected to be apparent to the court. *See Hernandez v. State*, 599 S.W.2d 614, 617 (Tex. Crim. App. 1980).

Here, appellant made no reference to the notebook or to its lyrics when making his objection, and the entire substance of his voir dire questioning of Detective Stanford related only to the chain of custody of the exhibit. Although the State mentioned the lyrics, appellant's only response was to object and argue that the court was "getting into stuff that's not even in evidence." At no point did appellant mention the lyrics or argue that they were more prejudicial than probative, and it does not appear in the record that the trial court reviewed the

18

lyrics. Appellant did not make a specific objection regarding the lyrics. Accordingly, we hold that appellant has not preserved this complaint for review. *See* TEX. R. APP. P. 33.1(a).

We overrule appellant's second and third issues.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Do not publish. TEX. R. APP. P. 47.2(b).